UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| RUMPKE OF KENTUCKY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:19-CV-182-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| TERRACON CONSULTANTS, INC., | ) | **AND ORDER** |
| f/k/a H.C. NUTTING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on several motions filed by both parties, including Defendant Terracon Consultants, Inc.'s ("Terracon") Motion to Strike Plaintiff's Supplemental Expert Witness Disclosures, [R. 82], Motion to Exclude the Testimony and Opinions of William T. Baldwin, Ph.D., [R. 85], Motion to Exclude the Testimony and Opinions of B. Michael Yacyshyn, [R. 86], and Motion for Summary Judgment, [R. 87], and Plaintiff Rumpke of Kentucky, Inc's ("Rumpke") Motion to Exclude Expert Testimony of William Fairchild, [R. 83], and Motion for Leave to File a Sur-Reply, [R. 101]. The motions have been fully briefed.[1] *See* [R. 88]; [R. 89]; [R. 90]; [R. 92]; [R. 93]; [R. 94]; [R. 95]; [R. 96]; [R. 97]; [R. 98]. The matters stand submitted for review.

For the following reasons, Terracon's Motion to Strike Plaintiff's Supplemental Expert Witness Disclosures, [R. 82], will be granted in part and denied in part; Rumpke's Motion to Exclude Expert Testimony of William Fairchild, [R. 83], will be granted; Terracon's Motion to

---

[1] Terracon did not file a response to Rumpke's Motion for Leave to File a Sur-Reply, and the time to do so has expired under the Joint Local Rules. *See* LR 7.1(c).

Exclude the Testimony and Opinions of William T. Baldwin, Ph.D., [R. 85], will be granted;

Terracon's Motion to Exclude the Testimony and Opinions of B. Michael Yacyshyn, [R. 86], will

be denied; Terracon's Motion for Summary Judgment, [R. 87], will be denied; and Rumpke's

Motion for Leave to File a Sur-Reply, [R. 101], will be granted.

## I.     Background

For the factual background of this action, the Court finds it most efficient to quote from

the prior district judge's Memorandum Opinion and Order denying Terracon's prior motion for

summary judgment.[2]  *See* [R. 66].  As United States District Judge William Bertelsman[3] explained:

### A.     Rumpke's Initial Retainer of Terracon and 2011 Slope Reconstruction Project

Plaintiff Rumpke owns and operates a landfill in Pendleton County, Kentucky.
[R. 59, p. 5][4].  The landfill is separated from Grassy Creek by a perimeter berm,
which prevents the steep slope on the west side of the landfill from sliding into the
creek.[5]  [R. 1, ¶¶ 13–14].  In August 2005, Rumpke observed cracks on the upper
bench of the perimeter berm.  [R. 59, p. 6].  In 2008, after monitoring the movement
of the landfill's slope and attempting to address the issue in other ways, Rumpke
engaged Defendant Terracon,[6] a geotechnical engineering company, for an analysis
of the cracking issues at the perimeter berm and for recommendations about how
to ensure the stability of the slope.  *Id.*  On August 7, 2008, Terracon sent Rumpke

---

[2] Other salient facts will be discussed in relation to particular motions.

[3] Judge Bertelsman handled this case until he took inactive status, at which point the case was
transferred to Judge Boom.  [R. 78].

[4] To the extent the page number listed on a filing differs from the page number assigned by the
Court's electronic docketing system, the Court refers to the page number assigned by the Court's
electronic docketing system.

[5] This berm is alternatively referred to as the "perimeter berm," "Perimeter Berm," and "West
Berm" in the record.

[6] Although Rumpke initially reached out to a company called H.C. Nutting for geotechnical
engineering consulting, H.C. Nutting was acquired by Terracon before its initial analysis of
Rumpke's perimeter berm was completed in August 2008.  [R. 1, ¶¶ 18–19].  The parties jointly
refer to all relevant work as having been performed by Terracon.  [R. 59, p. 6 n.3]; [R. 62, p. 2
n.1].

a letter summarizing its preliminary analyses and identifying three potential remedial measures: (1) rebuild the existing slope; (2) install drilled pier walls; or (3) build a soil buttress. [R. 1-2, pp. 2–3]. Terracon stated that its assumptions and proposed remedial measures were "based on limited data and may not be representative of the actual conditions on the slope" and that "[t]o confirm these assumptions and the analysis supporting the remedial measures, a geotechnical exploration should be conducted."[7] *Id.* at 3.

In May 2009, Terracon excavated three test pits at the perimeter berm and, in January 2010, Terracon sent Rumpke a second letter affirming its original opinion that reconstruction of the slope would "result in a more favorable stability condition." [R. 62, p. 7]; [R. 1-3, p. 3]. Terracon also stated that its recommendations would "meet or exceed the minimum requirements of 401 KAR 48:080 Section 10 for structural integrity of the landfill components."[8] [R. 1-3, p. 3]. Rumpke personnel rebuilt the existing slope between June 2, 2010, and January 7, 2011, while Terracon provided quality assurance and observation services. [R. 59, p. 8]. The parties did not execute a written contract at any point between Rumpke's initial engagement of Terracon in 2008 and the completion of the slope reconstruction project in 2011. *Id.*

### B.    Rumpke's Reengagement of Terracon in 2014 and Buttress Fill Project

Three years after completion of the slope reconstruction, in 2014, Rumpke again observed creep movement and small tension cracks on the perimeter berm. [R. 62, p. 8]. Rumpke reengaged Terracon and, in August 2014, Terracon provided Rumpke with a proposal for additional services regarding the perimeter berm. [R. 59, p. 9]. On September 22, 2014, the parties executed an Agreement for

---

[7] Judge Bertelsman noted that the parties agreed that no geotechnical exploration was ever conducted but disputed whether Rumpke declined to pay for such exploration. [R. 66, p. 2 n.2 (citing [R. 59, p. 7])]; [R. 62, pp. 6–7 n.5]). However, Judge Bertelsman determined this dispute was not relevant to Terracon's motion for summary judgment. *Id.*

[8] That regulation states:

Structural Integrity of Cap and Liner. The design engineer shall analyze the structural integrity of the site, the subbase, each component of the composite liner, each component of the final cover, the composite liner system and the final cap as a system. Modifications to the design shall be provided where necessary, to achieve a minimum factor of safety of two (2) for the subbase, one and one-fourth (1.25) for the structural design of the facility liner components, and one and one-half (1.5) for the final cover system. Synthetic liner material and structural synthetic materials shall be designed for a maximum elongation of ten (10) percent.

401 KAR 48:080 Section 10.

Services (the "2014 Agreement"). *Id.* The 2014 Agreement contained a provision limiting Terracon's potential liability arising out of its services or the agreement to the greater of $50,000 or the amount of its fee.[9] *Id.* The 2014 Agreement also provided that "NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR . . . ANY SPECIAL, CONSEQUENTIAL, INDIRECT, PUNITIVE, OR EXEMPLARY DAMAGES." *Id.* at 10; [R. 1-5, p. 7]. Further, the 2014 Agreement stated that "[c]auses of action arising out of Consultant's services or this Agreement regardless of cause(s) or the theory of liability, including negligence, indemnity or other recovery shall be deemed to have accrued and the applicable statute of limitations shall commence to run not later than the date of Consultant's substantial completion of services on the project." [R. 1-5, p. 6]. Terracon also warranted in the 2014 Agreement that it would perform the relevant services "in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions in the same locale." *Id.* Terracon charged Rumpke $44,919.22 in fees for services rendered pursuant to the 2014 Agreement. [R. 59, p. 10].

In July 2015, Terracon provided Rumpke with an updated assessment of the perimeter berm, noting that it continued to experience minor tension cracks and creep movement. [R. 62, p. 9]. Terracon then proposed four remedial options: (1) build a soil buttress; (2) excavate/reconstruct the slope; (3) install stub piers; or (4) some combination of the first three options. *Id.*; [R. 1-6, pp. 5–6]. Rumpke

---

[9] The provision states:

> CLIENT AND CONSULTANT HAVE EVALUATED THE RISKS AND REWARDS ASSOCIATED WITH THIS PROJECT, INCLUDING CONSULTANT'S FEE RELATIVE TO THE RISKS ASSUMED, AND AGREE TO ALLOCATE CERTAIN OF THE ASSOCIATED RISKS. TO THE FULLEST EXTENT PERMITTED BY LAW, THE TOTAL AGGREGATE LIABILITY OF CONSULTANT (AND ITS RELATED CORPORATIONS AND EMPLOYEES) TO CLIENT AND THIRD PARTIES GRANTED RELIANCE IS LIMITED TO THE GREATER OF $50,000 OR CONSULTANT'S FEE, FOR ANY AND ALL INJURIES, DAMAGES, CLAIMS, LOSSES, OR EXPENSES (INCLUDING ATTORNEY AND EXPERT FEES) ARISING OUT OF CONSULTANT'S SERVICES OR THIS AGREEMENT. PRIOR TO ACCEPTANCE OF THIS AGREEMENT AND UPON WRITTEN REQUEST FROM CLIENT, CONSULTANT MAY NEGOTIATE A HIGHER LIMITATION FOR ADDITIONAL CONSIDERATION. THIS LIMITATION SHALL APPLY REGARDLESS OF AVAILABLE PROFESSIONAL LIABILITY INSURANCE COVERAGE, CAUSE(S) OR THE THEORY OF LIABILITY, INCLUDING NEGLIGENCE, INDEMNITY, OR OTHER RECOVERY. THIS LIMITATION SHALL NOT APPLY TO THE EXTENT THE DAMAGE IS PAID UNDER CONSULTANT'S COMMERCIAL GENERAL LIABILITY POLICY.

[R. 1-5, p. 6].

chose to proceed with a buttress fill and, on November 2, 2017, the parties executed a second Agreement for Services (the "2017 Agreement"), which contained the same limitation of liability and statute of limitations provisions, along with the same warranty as the 2014 Agreement.  [R. 59, p. 11]; [R. 1-7, pp. 7–8].  Terracon charged Rumpke $9,985.00 in fees pursuant to the 2017 Agreement.  [R. 59, p. 11].  In May 2018, Rumpke began soliciting bids from contractors for the construction of the buttress fill on the perimeter berm and ultimately chose Hinkle Construction Services, LLC ("Hinkle").  [R. 62, p. 9].

On September 12, 2018, the parties executed another Agreement for Services (the "2018 Agreement"), which contained the same statute of limitations provision and warranty as the 2014 and 2017 Agreements, along with a limitation of liability provision which was substantially the same as the 2014 and 2017 Agreements, except that it limited Terracon's potential liability to the greater of $10,000 or its fee, instead of the $50,000 limit imposed by the earlier Agreements.  [R. 1-10, pp. 6–7].  Terracon charged Rumpke $35,372.50 for services rendered under the 2018 Agreement.  [R. 59, p. 12].  In late 2018, Hinkle began construction on the buttress fill.  *Id.*

### C.    Significant Lateral Movement and Formation of Toe Bulges Between December 17-19, 2018

Additional tension cracks began to appear on the perimeter berm as Hinkle began the buttress fill in November 2018.  [R. 62, p. 10].  In a November 27, 2018, email, Ron Ebelhar of Terracon told Rumpke that "there ha[ve] been no apparent indications of toe bulges downslope – this would be an indication of more serious issues." *Id.*; [R. 57-1, p. 662].  Ebelhar later confirmed that the cracks found in November 2018 were the same type of tension cracks that had previously been found on the perimeter berm. [R. 62, p. 10]; [R 57-1, p. 66 (Ebelhar Dep. at 250:22–251:10)].

On December 17, 2018, the perimeter berm experienced, for the first time, cracks that were more significant than the typical tension cracks.  [R. 62, p. 11]; [R. 57-1, p. 72 (Ebelhar Dep. at 277:15– 22)].  Two days later, on December 19, 2018, Terracon confirmed that there was "significant lateral movement (over 2 feet at some survey points) toward the creek." [R. 62, p. 11]; [R. 57-1, p. 706].  Terracon also alerted Rumpke to the occurrence of toe bulges at the foot of the landfill for the first time on December 19, 2018. [R. 62, p. 11]; [R. 57-1, p. 75 (Ebelhar Dep. at 286:5–25)].  Rumpke categorizes the significant lateral movement and toe bulge formation as a "catastrophic geological event" and, as a result, terminated Terracon on December 26, 2018.  [R. 62, p. 12].

In 2019, Rumpke hired Civil & Environmental Consultants, Inc. ("CEC") to evaluate the adequacy of the services and recommendations provided by Terracon. *Id.*; [R. 1, ¶ 62].  CEC concluded that, in 2008, Terracon should have performed a complete geotechnical exploration to confirm its initial assumptions.  [R. 62, p. 13]; [R. 52-1, pp. 17–18]. According to CEC, Terracon should have realized that the

only viable remedial measure in both 2008 and 2015 was drilled pier walls and the alternative remedial measures proposed by Terracon evidence a failure to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances. [R. 52-1, p. 22].  CEC opined that, if drilled pier walls had been originally installed in 2010 and 2011, instead of the slope reconstruction that was performed, the ongoing instability of the landfill's perimeter berm would have been prevented.  *Id.* at 19.

[R. 66, pp. 1–7 (formatting of record citations updated) (cleaned up)].

On December 13, 2019, Rumpke filed its Complaint against Terracon, alleging claims of (1) professional negligence; (2) gross negligence; (3) breach of express and implied warranties; (4) breach of contract; and (5) unjust enrichment.  *See* [R. 1].  In its Complaint, Rumpke alleged that "[a]s a direct and proximate result of H.C. Nutting/Terracon's professional negligence, gross negligence, breaches of warranty, breaches of contract, and unjust enrichment, Rumpke incurred over $1 million in damages in connection with H.C. Nutting/Terracon's fees, as well as construction costs associated with the insufficient remedial measures recommended by Terracon."  *Id.* at ¶ 6.  "In addition, Rumpke ultimately hired another geotechnical engineer and construction company to install drilled pier walls at the Landfill at a cost of more than $3.4 million."  *Id.*  The company that Rumpke hired to install the drilled pier walls in 2019 was Civil Solutions Associations, Inc. ("CSA").  *See, e.g.*, [R. 85, p. 2].

On February 12, 2020, Terracon filed a motion to dismiss on statute of limitations grounds, [R. 20], which was denied, [R. 25].  Terracon then filed its Answer, [R. 27], and the parties proceeded to engage in discovery, *see, e.g.*, [R. 30] (Scheduling Order).  As will be discussed in more detail below, certain deadlines in this action, particularly those relating to expert discovery, have been reset multiple times throughout this litigation.  *See infra* Section II.

On June 24, 2022, Terracon filed a motion for summary judgment on non-expert issues, *see* [R. 59]; [R. 53, ¶ 6] (joint request for dispositive motion deadline on non-expert issues), which

was fully briefed, *see* [R. 62]; [R. 63].  Upon consideration, the Court (through Judge Bertelsman) found Kentucky law applied to all of Rumpke's claims.  *See* [R. 66, p. 10].  The Court also rejected Terracon's renewed statute of limitations argument, *see id.* at 10–15, and found the parties' agreements limited Rumpke's damages to $135,372.50, but "only for complained-of conduct that occurred after September 22, 2014, when the first Agreement was executed."  *Id.* at 16, 18 ("Thus, the Court finds that there is no factual dispute as to whether damages would be paid under Terracon's commercial general liability policy and the limitation of liability provisions cap Rumpke's damages at $135,372.50 for conduct that occurred after September 22, 2014.").  Last, the Court found Rumpke's gross negligence claim and request for punitive damages failed as a matter of law.  *See id.* at 19–20, 22–24.  Thus, after prior motions practice, only Rumpke's professional negligence, breach of warranties, breach of contract, and unjust enrichment claims remain.

Following the Court's Memorandum Opinion and Order on Terracon's motion for summary judgment on non-expert issues, the parties participated in a settlement conference with United States Magistrate Judge Candace J. Smith.  *See* [R. 72].  A settlement was not achieved, *see id.*, and after the parties disagreed as to whether further alternative dispute resolution techniques would be beneficial, *see* [R. 75, ¶¶ 1–2], Magistrate Judge Smith set deadlines for expert matters in this action.  *See* [R. 76].  On August 25, 2023, this matter was transferred to the undersigned when Judge Bertelsman assumed inactive status.  *See* [R. 78].

On September 15, 2023, Terracon filed a Motion to Strike Plaintiff's Supplemental Expert Witness Disclosure.  [R. 82].  The parties fully briefed that motion, *see* [R. 88]; [R. 90].  Terracon then filed a Motion to Exclude the Testimony and Opinions of William T. Baldwin, Ph.D., [R. 85], a Motion to Exclude the Testimony and Opinions of B. Michael Yacyshyn, [R. 86], and a Motion

for Summary Judgment.  *See* [R. 87].  All of those motions have been fully briefed and stand submitted for review.  *See* [R. 92]; [R. 93]; [R. 94]; [R. 96]; [R. 97]; [R. 98].

For its part, Rumpke filed a Motion to Exclude Expert Testimony of William Fairchild, a former Rumpke employee whom Terracon has indicated that it may call.  *See* [R. 83].  That motion has likewise been fully briefed.  *See* [R. 89]; [R. 95].  Rumpke has also filed a Motion for Leave to File a Sur-Reply to Terracon's motion to strike and Terracon's motion to exclude Mr. Yacyshyn's testimony and opinions.  [R. 101].  Notably, Terracon did not file a response in opposition to Rumpke's request, and the time to do so under the Joint Local Rules has long since expired.  *See* LR 7.1(c).  Further, Rumpke has tendered its proposed sur-reply as an exhibit to its motion for leave.  *See* [R. 101-1].  The Court will therefore grant Rumpke's motion for leave and will consider Rumpke's sur-reply in analyzing the other motions.

## II.    Terracon's Motion to Strike

The Court will first consider Terracon's Motion to Strike Rumpke's Supplemental Expert Witness Disclosure.  [R. 82].  Through its briefing on that motion, Terracon asks the Court to preclude Rumpke from calling Danny Anderson, an individual from the Kentucky Department of Waste Management ("DWM"), in its case in chief and in rebuttal.  *See, e.g.*, *id.*; [R. 90].  To understand Terracon's request, the Court must discuss certain aspects of the procedural history of this case.

This action has been pending for nearly five years, and the parties' deadlines have been reset numerous times.  Relevant here, the parties' expert disclosure deadlines were pushed back several times while the parties proceeded through discovery.  For context, the Court will begin its discussion of the expert disclosure deadlines with those set by the Court on March 15, 2021.  *See* [R. 34, p. 1] (setting deadlines for "Rule 26(a)(2)(A) expert witness identify disclosure

accompanied by either (a)(2)(B) report or (a)(2)(C) summary disclosure"). Under that order, Rumpke's expert disclosure deadline was set for July 26, 2021, Terracon's expert disclosure deadline was set for September 27, 2021, and Rumpke's rebuttal expert disclosure deadline was set for November 29, 2021. *Id.*

On July 26, 2021, Rumpke disclosed B. Michael Yacyshyn, P.E. and/or Jeremy J. Heyerly, P.E., and William T. Baldwin, Jr., Ph.D., as expert witnesses. *See* [R. 35, p. 1]. On August 16, 2021, the parties filed a Joint Motion for Entry of Revised Scheduling Order, [R. 40], in which the parties represented that Rumpke had "provided its expert disclosures on July 26, 2021 as required" and that the parties expected then-upcoming depositions might impact the opinions to be offered by the parties experts. *See id.* at 1–2. Therefore, the parties requested the Court enter an order establishing a deadline for any supplementation of Rumpke's experts and extending the remaining deadlines set forth in the then-current scheduling order. *Id.* at 2. On August 24, 2021, the Court granted the parties proposed order and set November 1, 2021, as the deadline for any supplementation by Rumpke of its experts, December 17, 2021, for Terracon's expert disclosures, and January 29, 2022, for Rumpke's rebuttal expert disclosures. *See* [R. 43, p. 1].

Three months later, on November 12, 2021, the parties filed another Joint Motion for Entry of Revised Scheduling Order. *See* [R. 45]. In that motion, the parties represented that they had exchanged written discovery, that eight fact witness depositions had taken place in September and October 2021, that Rumpke provided its expert disclosures as required on July 26, 2021, and that Terracon agreed to provide Rumpke with an extension until November 10, 2021, to provide its updated expert disclosures. *See id.* at 1. At that time, the parties stated their belief that other fact depositions (including one that was scheduled for December 8, 2021) could impact the opinions to be offered by their experts. *See id.* at 2. Thus, the parties observed that it might be helpful for

the Court to set separate deadlines for the completion of fact discovery and for the completion of all discovery. *See id.* The Court again granted the parties' joint motion, and set the fact discovery cutoff as February 18, 2022, and set the supplementation deadline for Rumpke of its experts as March 18, 2022, the deadline for Terracon to disclose its experts as May 18, 2022, and the deadline for Rumpke's rebuttal expert disclosures as June 17, 2022. *See* [R. 46, p. 1].

On March 18, 2022, Rumpke disclosed Mr. Yacyshyn, Mr. Heyerly, and/or Mr. Anthony W. Eith, P.E., and Dr. Baldwin as experts. *See* [R. 52, p. 1 ("This Expert Witness Disclosure and accompanying reports fully replace, supplant, and supersede any expert reports previously provided by Rumpke or Expert Witness Disclosures made by Rumpke, including but not limited to the October 30, 2019 Civil & Environmental Consultants, Inc. ('CEC') expert opinion letter provided to Terracon prior to litigation, as well as Rumpke's previous Expert Witness Disclosure of July 26, 2021 (Doc. #35.)")]. Mr. Yacyshyn's report (with his colleagues at CEC) that was disclosed at that time discusses 401 KAR 48:080, a Kentucky regulation relating to landfills:

> The Kentucky Administrative Regulations (401 KAR) for design of solid waste landfills are provided in Section 48. 401 KAR 48:080 Sections 3 and 10 require minimum factors of safety of two (2) for the landfill subbase/subgrade material. As the West Berm slope supports the structural fill used as subgrade/subbase for support of landfill construction, the appropriate factor of safety for Terracon's design remedial measures should have been 2.0.

[R. 52-1, p. 7].

On March 31, 2022, the parties filed another Joint Motion for Entry of Revised Scheduling Order. [R. 53]. In that motion, the parties restated their belief (as discussed during a status conference with the Court) "that it would be beneficial to submit dispositive motions on certain legal issues before proceeding with expert witness depositions." *See id.* at 2. The parties therefore requested that the Court set a dispositive motion deadline on non-expert issues and extend expert discovery so that expert witness depositions could proceed following resolution of any dispositive

motions on non-expert issues. *See id.* The Court again granted the parties' joint motion and set the following deadlines:

(1) Rule 26(a)(2)(A) expert witness identify disclosure accompanied by either(a)(2)(B) report or (a)(2)(C) summary disclosure

    a. Any supplementation by Plaintiff's experts – by March 18, 2022 (COMPLETED)

    b. Defendant's experts – by May 18, 2022

    c. Plaintiff's rebuttal experts – by June 17, 2022 (2) Dispositive Motion Deadline (non-expert issues) – by June 24, 2022 (3) Completion of all expert discovery – 60 days after Court's disposition of dispositive motions (non-expert issues)

(2) Dispositive Motion Deadline (non-expert issues) – by June 24, 2022

(3) Completion of all expert discovery – 60 days after Court's disposition of dispositive motions (non-expert issues)

(4) Status Report – 75 days after Court's disposition of dispositive motions (non-expert issues)

(5) Dispositive Motion Deadline (expert issues) – 105 days after Court's disposition of dispositive motions (non-expert issues)

[R. 54, pp. 1–2 (emphasis omitted)].

On May 18, 2022, Terracon provided its expert disclosures, in which it listed Timothy C. Siegel, P.E., G.E., D.GE., and Stephen L. Buffo as retained experts and several individuals as non-retained experts, including "[a] representative of the Kentucky Department of Environment Protection Division of Waste Management ('DWM')." *See* [R. 55, pp. 1–2]. Specifically, regarding the DWM representative, Terracon stated:

Based on issues newly raised by Rumpke in the March 18, 2022 amended report prepared by Civil & Environmental Consultants, Inc., Terracon reserves the right to call a representative or former employee of DWM to testify regarding DWM's functions and its practices and procedures relating to the review and approval of applications for permits and permit modifications. Terracon discloses this potential

witness pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) to the extent that his or her testimony may be deemed expert in nature.

*Id.* at 2.

Mr. Siegel's report that was disclosed at this time contained several conclusions.  Relevant here, Mr. Siegel opined:

> To a reasonable degree of engineering certainty, Terracon's use of an appropriate design factor-of-safety for the West Berm is evidenced by the approval of the applicable permit modification.  My experience is the regulatory agency for a landfill and its appurtenances approve the permit and any modification applications provided that the design (in this case the West Berm) meets the requirements of any applicable regulations.  Thus, the evidence that the West Berm was successfully permitted by the regulatory agency proves the use of an appropriate design factor-of-safety.  It is typical in practice and it is reasonable and within the standard of care for an engineer to rely on approval from the regulating authority for confirmation that the design complies with any applicable regulation.

[R. 55-1, p. 9].  Mr. Siegel's report, however, did not contain the term "subbase."

Roughly a month later, on June 17, 2022, Rumpke provided its rebuttal expert witness disclosure, in which it again listed Mr. Yacyshyn, Mr. Heyerly, and/or Mr. Eith, and Dr. Baldwin.  *See* [R. 56, p. 1].  That rebuttal disclosure also listed "[a] representative of the Kentucky Department of Environmental Protection, Division of Waste Management ('DWM')."  *Id.*  The disclosure continued:

> Rumpke reserves the right to call a representative or former employee of DWM to testify in rebuttal to any opinion or testimony provided or elicited by Defendant Terracon Consultants, Inc., related to DWM's functions and its practices and procedures related to the review and approval of applications for permits and permit modifications.  Rumpke discloses this potential non-retained rebuttal expert witness pursuant to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure, to the extent that his or her testimony may be deemed expert in nature.

*Id.* at 1–2.

On June 24, 2022, Terracon filed its motion for summary judgment on non-expert issues.  *See* [R. 59].  As discussed above, Judge Bertelsman considered that motion on a full record and

granted the motion in part and denied the motion in part.  *See* [R. 66].  Following Judge Bertelsman's decision, the parties participated in a settlement conference with Magistrate Judge Smith in January 2023.  *See* [R. 72].  However, the parties were unable to reach a settlement, so the Court requested input from the parties regarding whether other forms of alternative dispute resolution might be helpful and regarding potential deadlines to help the case proceed.  *See* [R. 74].  Ultimately, the parties were unable to agree regarding any further alternative dispute resolution techniques, so the Court set new deadlines for the completion of all discovery (September 1, 2023), for a close-of-discovery status report (September 1, 2023), and for dispositive motions (on expert issues) or *Daubert* motions (September 29, 2023).  *See* [R. 76].

On May 24, 2023, Terracon deposed Mr. Yacyshyn.  *See, e.g.*, [R. 82-1, p. 2].  Three days before that, Rumpke had produced Mr. Yacyshyn's file to Terracon, which contained an email showing Mr. Yacyshyn had obtained contact information for Mr. Anderson of DWM in October 2021.  *See* [R. 82, p. 6].  During his deposition, when asked about the appropriate design factor of safety for the West Berm, Mr. Yacyshyn testified that he and his colleagues had confirmed their opinion regarding the appropriate design factor of safety for the West Berm by speaking with Mr. Anderson, who was the "solid waste department head for Kentucky."  *See* [R. 82-1, p. 3 (Yacyshyn Dep. at 146)]; *see also* [R. 82, pp. 6–7].

On August 29, 2023, Rumpke deposed Mr. Siegel, Terracon's geotechnical expert.  *See* [R. 88-1, p. 2].  During his deposition, Mr. Siegel was asked to define "subbase" as used in 401 KAR 48:080 and was asked whether he would consider the West Berm to be "subbase."  *See id.* at 53–54 (Siegel Dep. at 201:15–202:25).  The transcript reads:

> Q   . . . First, how would you define the term "subbase" as it's used in this regulation?

A  I would say for anything that the regulatory agency considers within the cap and liner, that -- probably -- I would review this as being below the landfill itself, going below a failure or a potential failure surface that goes below the landfill containment system.

Q  Would you consider the west berm which is holding back cells on the -- of the landfill be part of the subbase --

A  I'm not --

Q   -- Pendleton County Sanitary Landfill?

A  I believe the only folks that could answer that would be the regulatory agency.

Q  And if -- you read Michael Yacyshyn's deposition?

A  Whose deposition?

Q  Michael Yacyshyn's.

A  Yes, I did.

Q  Did you see where he -- where CDC reached out to Danny Anderson and KDEP to confirm what factor-of-safety should be applied the west berm and that they commented that it should be designed to the 2.0 as noted in Section 10?

A  You know, I don't remember that.

Q  If a KDEP representative confirmed that any – that the subbase – that the west berm falls under a subbase because it's holding back the limits of waste, do you have any reason to disagree with that?

A  Again, I've got no -- I'm not -- I don't feel like I'm equipped to answer it one way or the other.  It would be in the eyes of the regulatory agency and the permitting agency.

*Id.*

Following Mr. Siegel's deposition, Rumpke "supplement[ed] its prior identification and disclosure of expert witnesses [] to identify the specific representative of the Kentucky Department of Environmental Protection, Division of Waste Management ('DWM'), who may be called upon

- 14 -

by Rumpke to testify as an expert at the trial of this matter." *See* [R. 80, p. 1].   The disclosure read:

> Rumpke identifies Danny Anderson, a representative of DWM, to testify, on direct or in rebuttal to any opinion or testimony provided or elicited by Defendant Terracon Consultants, Inc., related to DWM's functions and its practices and procedures related to the review and approval of applications for permits and permit modifications, and to testify regarding the requirements of 401 KAR 48.080 (10), his and/or the Division's interpretation of 401 KAR 48.080 (10), his and/or the Division's opinions that the proposed remedial options for the West Berm of the Pendleton County Sanitary Landfill would be considered subbase, which required a factor of safety of 2.0 under 401 KAR 48.080 (Section 10), and the scope of the Division's May 7, 2010 Approval related to APE 20090004, Solid Waste Permit #096-00001.   Mr. Anderson may also be called to testify regarding a conversation he had with Rumpke's expert, Michael Yacyshyn.

*Id.* at 1–2.

Through its motion, Terracon asks that the Court strike Rumpke's supplemental expert disclosure of Mr. Anderson.  *See* [R. 82].  As grounds for its motion, Terracon argues that, through the disclosure, Rumpke improperly tried to name Mr. Anderson as an affirmative expert, and that Rumpke's supplement was not compliant with Federal Rule of Civil Procedure 26 and should be stricken under Rule 37.  *See id.*

As a preliminary matter, the Court notes that Rumpke clarified in its response that its reference to calling Mr. Anderson as a "direct" witness was a mistake and that it would only seek to call him as a rebuttal expert.  *See* [R. 88, p. 1 ("The docket-entry reference to Rumpke's initial Expert Witness Disclosure (Doc. # 52) was included for completeness and the reference to any 'direct' testimony was, frankly, a mistake.")].  Terracon's motion can thus be granted to the extent it seeks to limit Rumpke's ability to call Mr. Anderson only as a rebuttal witness.

Otherwise, however, the Court finds Terracon's motion to strike unsupported by the procedural posture and record of this case.  First, as Rumpke argues in its response, its supplementation of its rebuttal expert disclosure was timely and proper under Rule 26(a)(2)(E).

*See id.* at 4–8.  That rule provides that "[t]he parties must supplement [expert-witness] disclosures when required under Rule 26(e)."  Fed. R. Civ. P. 26(a)(2)(E).  Rule 26(e), in turn, provides that, in general:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> > (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
> >
> > (B) as ordered by the court.

Fed. R. Civ. P. 26(e)(1).  And the advisory committee notes to Rule 26(e) explain that:

> The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect. There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition or when an expert during a deposition corrects information contained in an earlier report.

*Id.* at advisory committee notes to 1993 amendments.

In its response, Rumpke represents that it supplemented its rebuttal disclosure to name Mr. Anderson as the specific representative of DWM whom it may call and "to further detail the particular aspects of 'DWM's functions and its practices and procedures related to the review and approval of applications for permits and permit modifications,' now that it was clear what Terracon's geotechnical expert may opine related to that topic."  [R. 88, p. 4].  The Court perceives no issue in Rumpke's supplementation.  Indeed, as Rumpke submits, Mr. Anderson's name had been discussed during Mr. Yacyshyn's deposition, and the detail provided by Rumpke regarding potential testimony of Mr. Anderson (regarding Kentucky regulations, which had been discussed

in Mr. Yacyshyn's and Mr. Siegel's depositions) strikes the Court as proper under the rules.  But even if Rumpke's supplementation of its expert disclosures was somehow untimely or otherwise improper under Rule 26, the Court finds such non-compliance may be excused under Rule 37.

Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *Clark v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:17-CV-419, 2023 WL 2316205, at *2 (W.D. Ky. Mar. 1, 2023) (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn. P.C.*, 388 F.3d 976, 983 (6th Cir. 2004)) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.").

"The Sixth Circuit recognizes harmlessness as the key under Rule 37, not prejudice." *Eaton Corp. v. Angstrom Auto., Grp., LLC*, No. 1:20-CV-893, 2023 WL 5968005, at *2 (N.D. Ohio Sept. 14, 2023) (quoting *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003)) (cleaned up); *see also Anderson v. United States*, No. 1:20-CV-00157, 2023 WL 171776, at *8 (W.D. Ky. Jan. 12, 2023).  "Harmlessness means 'an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" *Eaton Corp.*, 2023 WL 5968005, at *2 (quoting *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015)).

In determining whether the non-compliant disclosure was substantially justified or harmless, the Sixth Circuit considers five factors:  "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."  *Howe*, 801 F.3d at 748

- 17 -

(quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)); *see also Clark*, 2023 WL 2316205, at *2–3 (quoting *Howe*, 801 F.3d at 748).

"The core goal of this evaluation is to separate honest, harmless mistakes from the type of underhanded gamesmanship that warrants the harsh remedy of exclusion." *Clark*, 2023 WL 2316205, at *3 (quoting *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019)) (cleaned up). Further, "[i]n lieu of exclusion, a court may also award reasonable expenses, including attorney's fees caused by the failure to disclose; inform the jury of the failure; or impose other appropriate sanctions including, but not limited to, treating facts as established for purposes of the action, prohibiting a party from introducing matters into evidence, striking pleadings, staying further proceedings, dismissing the action, rendering a default judgment, or treating the failure to disclose as contempt of court." *Id.* (citing Fed. R. Civ. P. 37(c)(1)).

In this case, the Court is unable to find much surprise on behalf of Terracon by Rumpke supplementing its disclosure to identify by name the DWM representative that it would seek to use as a rebuttal expert witness. Here, the Court observes that Terracon had first listed a DWM representative in its expert disclosures, *see* [R. 55, p. 2], and that Rumpke had likewise listed a DWM in its rebuttal expert disclosures, *see* [R. 56, p. 1]. Further, Mr. Anderson's name was present in Mr. Yacyshyn's file Terracon received prior to Mr. Yacyshyn's deposition, and Mr. Yacyshyn mentioned during his deposition that Mr. Anderson was the individual one of his colleagues had spoken to from the state. The regulatory provisions included in Rumpke's supplemental disclosure of Mr. Anderson had similarly been included in Mr. Yacyshyn's report on March 18, 2022, and were covered during the geotechnical experts' depositions. Given this record, the Court is unable to see the surprise claimed by Terracon; it therefore views little surprise in need of curing.

As to the other factors, third, no trial date has been set in this matter, so there is little harm that trial will be disrupted by the Court declination to strike Rumpke's supplemental expert disclosures.  Next and fourth, the evidence appears important, particularly regarding Terracon's defensive theories for why it was not professionally negligent, including that Terracon had properly relied on a permit it was issued by the state regulatory agency.  *See* [R. 88, p. 10 (Rumpke's response discussing one of Terracon's defensive theories)].  Fifth, Rumpke has explained that it only sought to do as it thought was required under the rules by supplementing its disclosure.  Weighing all these factors, the Court finds the lack of surprise to Terracon drives the analysis, especially when viewed through Rumpke's representations that it sought to supplement its rebuttal expert disclosure following Mr. Siegel's deposition.

Terracon's motion to strike, [R. 82], will therefore be granted in part (as discussed above) and denied in part, and its request for attorney's fees will likewise be denied.

But one final point bears mentioning.  In its reply, Terracon argues that, even if Rumpke's supplemental disclosure of Mr. Anderson can be excused under Rule 37, his proffered opinions would be inadmissible to the extent they are legal interpretations.  *See* [R. 90, pp. 9–10].  However, the Court need not pass upon such an argument at this time, as the contours of any testimony by Mr. Anderson will necessarily be dictated by how the trial plays out, meaning the Court can defer consideration of this argument to a later time when and if the concern arises.  *See Grayiel v. AIO Holdings, LLC* (*Grayiel 2*), No. 3:15-CV-821, 2019 WL 2372899, at *1 (W.D. Ky. Apr. 29, 2019) ("Defendants will be free to object at trial if [the expert's] opinions veer too far off course from providing factual conclusions from which the jury may draw inferences, which are appropriate, and borders into drawing legal conclusions on the ultimate issues of fraud in this case, which are inappropriate.");  *cf. Anderson*, 2023 WL 171776, at *1 (discussing motions in limine and

explaining, "[a]bsent evidence that is patently inadmissible for any purpose, courts may defer issues until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context") (quoting *United States v. Stone*, 543 F.Supp.3d 535, 539 (W.D. Ky. 2021)) (cleaned up).

### III.   Motions to Exclude

#### A.   Legal Standard

"Admissibility in federal court, including the admissibility of expert testimony, is determined by federal standards even when a case such as this one is tried in diversity." *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608, 2020 WL 1189937, at *2 (W.D. Ky. Mar. 12, 2020) (internal quotation marks omitted).  As a result, Federal Rule of Evidence 702, which governs the use of expert testimony, guides the Court's analysis.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under this rule, as amended, the trial judge is the gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (recognizing "a gatekeeping role for the judge" under Rule 702).

The Sixth Circuit has found that, based on the language of Rule 702, an expert's opinion is admissible if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

"Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592). Accordingly, the Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Ultimately, "a witness is not a qualified expert simply because he self-identifies as such," but courts "take a liberal view of what knowledge, skill, experience, training, or education is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015) (internal quotation marks omitted).

Rule 702 also guides the trial court by providing general standards to assess reliability: whether "the testimony is based on sufficient facts or data," "whether the testimony is the product of reliable principles and methods," and whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, the Supreme Court has provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony, including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). However, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the

- 21 -

facts of a particular case." *In re Scrap Metal*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  Thus, the Sixth Circuit has "recognized that the *Daubert* factors are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *Id.* (internal quotations omitted).

The proponent of the testimony bears the burden of establishing its admissibility by a preponderance of proof.  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).  And "[a]ny doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *In re: E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015) (citations omitted); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.").  Therefore, "rejection of expert testimony is the exception, rather than the rule, and [courts] will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal*, 527 F.3d at 530 (cleaned up).

### B.   The Parties' Motions to Exclude

#### 1.   Rumpke's Motion to Exclude Expert Testimony of William Fairchild

First, Rumpke asks the Court to exclude any expert testimony by William Fairchild, whom Terracon disclosed as a non-retained expert witness.  *See* [R. 83]; *see also* [R. 55, p. 2].  Terracon's expert disclosures regarding Mr. Fairchild stated:

> Mr. Fairchild is a licensed professional engineer and Rumpke's former Site Engineer for the Pendleton County Landfill.  He may be called to testify consistently with his deposition testimony regarding Rumpke's practices and procedures, the history of the western perimeter berm at the Pendleton County Landfill, the relationship between Rumpke and Terracon, communications between Rumpke and Terracon, and the work performed by Terracon for Rumpke.  Terracon discloses this potential witness pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) to the extent his testimony may be deemed expert in nature.

[R. 55, p. 2].

Through its motion, Rumpke challenges the last area proffered by Terracon as a topic Terracon might address with Mr. Fairchild: "the work performed by Terracon for Rumpke." *See* [R. 83, p. 1].   Rumpke argues that Mr. Fairchild, by his own admission, is not a geotechnical engineer and therefore he cannot satisfy Rule 702's "knowledge, skill, experience, training, or education" requirement or its reliability requirement. *See id.* at 3–7.  In response, Terracon argues that Rumpke is simply afraid of what Mr. Fairchild would testify to and that he should be able to testify regarding his firsthand knowledge of the events giving rise to this litigation because he was the "point of contact" between Rumpke and Terracon.  *See* [R. 89, p. 1].   Terracon also faults Rumpke for "fail[ing] to identify a specific opinion that should be excluded." *Id.* at 5.

As to Terracon's first argument, Rumpke expressly acknowledges that it "does not seek to prevent Mr. Fairchild from testifying as a fact witness" and that it "is not asking the Court to preclude Mr. Fairchild from providing fact testimony." [R. 95, pp. 1, 14].  Instead, Rumpke asks the Court to limit Mr. Fairchild's testimony in eight ways that it argues are impermissible expert testimony.  Specifically, Rumpke argues that:

> any opinions Mr. Fairchild may offer regarding (1) the standard of care expected of a reasonably competent geotechnical engineer, (2) whether Terracon breached its duty of care by proposing remedial measures that would not (and could not) provide long-term slope stability, (3) the expected geotechnical stability and longevity of the three remedial measures proposed, (4) whether testing or geotechnical exploration was necessary or possible, (5) whether any assumptions relied on by Terracon were capable of confirmation or appropriate to rely on, (6) whether the failure of the slope could have been avoided, (7) the required factors of safety related to Terracon's work on the perimeter berm, or (8) the appropriateness of Terracon's geotechnical recommendations, fail to meet the evidentiary standards for expert testimony and Terracon should be excluded from eliciting such testimony at trial.

[R. 83, p. 2].

Here, the Court pauses to observe that Sixth Circuit case law recognizes that "rejection of expert testimony is the exception, rather than the rule" and that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (first quoting *In re Scrap Metal,* 527 F.3d at 530); then quoting *Morales v. Am. Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir.1998)). Still, the Sixth Circuit has upheld the exclusion by district courts of expert testimony when the Federal Rules of Evidence have not been satisfied.

For example, in *Burgett*, the plaintiffs sought to call an experienced mechanical engineer, who had been working as a forensic engineer, to offer expert testimony on how a lawn mower may have malfunctioned. *See id.* at 374–75. The defendants moved to exclude the witness's testimony, and the district court granted that motion, finding the witness "unqualified to offer his purportedly expert opinions." *Id.* at 376. On appeal, the Sixth Circuit affirmed and found the district court did not abuse its discretion by excluding the witness's testimony. The Sixth Circuit explained:

> The district court did not abuse its discretion in excluding [the expert] from testifying about biomechanical issues and human factors. Both of these fields are proper topics for expert testimony. It thus follows that a witness opining on these subjects must be qualified to do so. But Plaintiffs concede that [the expert] has admitted that he is *not* an expert in biomechanics or human factors—either by education or training. [The expert] might be able to apply some common sense to these issues, but the district court would then be well within its rights to exclude this testimony.

*Id.* at 377 (internal citations omitted).

The Court finds the reasoning of *Burgett* instructive for this case. First, the area of geotechnical engineering is a field that is a proper topic for expert testimony. *See Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 855–56 (E.D. Ky. 2013) ("[the witness] explicitly bases his testimony on his specialized knowledge as a geotechnical engineer, and his opinion concerns matters outside the knowledge of the average juror."). As a general matter, the eight areas that

Rumpke seeks to preclude Mr. Fairchild from testifying as an expert on would necessitate specialized knowledge, skill, experience, and training.  Thus, to offer such opinions, Mr. Fairchild would need to be qualified as an expert under Rule 702.  However, just like the expert in *Burgett*, Mr. Fairchild admits he is not an expert in geotechnical engineering.  [R. 95-1, p. 5 (Fairchild Dep. at 117:4–19)]; *cf. Burgett*, 579 F. App'x at 377.

In this case, Mr. Fairchild cannot satisfy Rule 702's first requirement—that the witness have "scientific, technical, or other specialized knowledge"—because, *by his own admission*, he is "certainly not a geotechnical expert."  *See, e.g.*, [R. 95-1, p. 5 (Fairchild Dep. at 117:4–19)].  Stated another way, Mr. Fairchild is not qualified to opine on geotechnical engineering topics under the Federal Rules of Evidence, and Rumpke's arguments for why Mr. Fairchild's proffered testimony should be stricken are well taken.  That said, Mr. Fairchild won't be precluded from testifying about any facts within his personal knowledge.  To the extent that he has personal knowledge of *factual* matters concerning Rumpke's decision-making process, "Rumpke's practices and procedures, the history of the western perimeter berm, and the relationship between Rumpke and Terracon, . . . and the work performed by Terracon for Rumpke," [R. 55, p. 2], he may so testify as long as that testimony does not veer into expert opinion testimony.

Terracon's second argument—that Rumpke has failed to identify what opinion by Mr. Fairchild it seeks to strike—is a bit disingenuous.  In this context, the Court looks to the language of Rule 26 that concerns "witnesses who do not provide a written report":

> Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
>> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>>
>> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C).  As other courts have explained, the rule has two components, one regarding subject matter and one regarding a summary of the facts and opinions of the witness. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, No. CV 5:18-435, 2021 WL 2382524, at *5 (E.D. Ky. June 10, 2021) ("[T]his disclosure may meet the subject matter prong— (a)(2)(C)(i)—but does not satisfy the separate summary of opinion prong—(a)(2)(C)(ii).") (internal quotation marks omitted).

On this record, Rumpke rightfully highlights that Terracon's disclosure of Mr. Fairchild (quoted above) failed to comply with the second component of Rule 26(a)(2)(C) because Terracon did not provide a summary of the facts and opinions to which Mr. Fairchild is expected to testify and only broadly listed the topics of his expected testimony.[10]  *See, e.g.*, [R. 95, pp. 2–4]; *cf. Kirilenko-Ison*, 2021 WL 2382524, at *5.  Thus, the Court perceives Terracon's argument that Rumpke has failed to identify specific problematic opinions that Mr. Fairchild might offer as an attempt by Terracon to shift an obligation it owes under the rules (to provide a summary of the facts and opinions its witness will offer) to Rumpke only to then criticize Rumpke for having to make an educated guess as to what Terracon's witness will say.

But the law places the burden on Terracon to show by a preponderance of proof that its witness's testimony is admissible, not for an opposing party to show that such testimony is *in*admissible.  *See Nelson*, 243 F.3d at 251 (citing *Daubert*, 509 U.S. at 592 n.10); *see also E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 753 (6th Cir. 2014) (discussing "a fallacy

---

[10] Rumpke does not rely on procedural non-compliance with the Rules as the rationale for striking Mr. Fairchild's testimony, but rather the *substance* of that expected testimony.  *See* [R. 83, p. 2 n.1].  In it's Reply, [R. 95], Rumpke makes a more extensive procedural argument, saying "Terracon's failure to properly disclose Mr. Fairchild's purported expert opinions in compliance with Rule 26(a)(2)(C), alone, requires the exclusion of such testimony." *Id.* at 3.  However, most of the parties' briefing is dedicated to the substance of the proposed testimony, so the Court focuses on that as well.

that pervades the [plaintiff's] entire argument on appeal, to wit: that it was [the defendant's] (or the district court's) burden to show that [the witness's] testimony was *in*admissible, rather than the [plaintiff's] burden to show that his testimony was admissible").  On this record, as it relates to Mr. Fairchild giving expert opinion testimony, Terracon has not carried its burden for all the reasons discussed above.  Rumpke's motion to exclude expert opinions of Mr. Fairchild's in the area of geotechnical engineering will be granted.[11]

The Court must address one final, half-hearted argument by Terracon.  Terracon alludes in its response that Mr. Fairchild's testimony may qualify as lay opinion testimony appropriate under Rule 701.  Namely, Terracon asserts

> Mr. Fairchild is obviously a fact witness who was personally involved in the circumstances giving rise to this case, and he may have lay opinions regarding those circumstances based on his own personal involvement and experience.  Terracon could elicit all the same from Mr. Fairchild as a fact witness, but disclosed him as a non-retained expert in an abundance of caution, to the extent that his testimony may be deemed expert in nature simply because he is or was a licensed professional engineer. . .

[R. 89, p. 7]; s*ee also id.* at 5–6 ("[n]or does Rumpke provide any authority to support its apparent belief that a witness cannot be qualified to testify to geotechnical engineering issues without holding the title of 'geotechnical engineer.'")]; [R. 55, p. 2 ("Terracon discloses this potential witness . . . to the extent his testimony may be deemed expert in nature.")].

Based on the Court's understanding, Rumpke does not seek to limit Mr. Fairchild from testifying in any way that falls within the parameters of Rule 701 but expresses concern that any "lay opinion" offered by Mr. Fairchild will really be expert testimony offered under the guise of 701.  *See* [R. 95, pp. 14–15].  Rumpke highlights the differences between lay and expert testimony

---

[11] Again, the Court's ruling will not prohibit Mr. Fairchild from testifying to facts within his personal knowledge, even potentially facts concerning "the work performed by Terracon for Rumpke," [R. 55, p. 2], so long as that testimony does not veer into impermissible opinion testimony.

and seeks to ensure that Mr. Fairchild stays on the right side of that line by not offering expert testimony that he is unqualified to give.  *See id.* at 14 (citing *United States v. White*, 492 F.3d 380, 401–03 (6th Cir. 2007)).

> Rule 701 governs lay opinion testimony.
>
> Rule 701 provides that lay witnesses can offer 'testimony in the form of an opinion' only when that testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

*Allied Erecting & Dismantling Co. v. United States Steel Corp.*, No. 22-3585, 2023 WL 5322213, at *6 (6th Cir. Aug. 18, 2023) (quoting Fed. R. Evid. 701).  "The party offering testimony under Rule 701 must establish that all three requirements are satisfied."  *Id.* (internal quotation marks omitted).

Importantly, "[p]arties are not permitted to bootstrap expert testimony in as lay witness testimony."  *Id.* at *7 (quoting *United States v. Darji*, 609 F. App'x 320, 338 (6th Cir. 2015)) (cleaned up).  "However, the distinction between lay witness and expert witness testimony 'is far from clear in cases where [] a witness with specialized or technical knowledge was also personally involved in the factual underpinnings of the case.'"  *Id.* (quoting *White*, 492 F.3d at 401).  "In such cases, courts must distinguish between the witness's lay testimony, which results from a process of reasoning familiar in everyday life, and the witness's expert testimony, which results from a process of reasoning which can be mastered only by specialists in the field."  *Id.* (quoting *White*, 492 F.3d at 401) (cleaned up).

Terracon argues that "Mr. Fairchild cannot separate his personal knowledge and experience from his professional knowledge and experience as an engineer, and, therefore, Terracon's disclosure was proper, his testimony is proper, and Rumpke's Motion should be denied."  [R. 89, p. 7].  But the law *requires* such a separation when a witness is not qualified to opine on matters

- 28 -

"which result from a process of reasoning which can be mastered only by specialists in the field." *Allied*, 2023 WL 5322213, at *7 (cleaned up).  As the Court made clear, opinions on geotechnical engineering require expert testimony and are beyond the layman's understanding.  *See Adler*, 986 F. Supp. 2d at 855–56.

The only case Terracon cites to support its argument that Mr. Fairchild may offer geotechnical engineering opinions as lay testimony fails to support its argument.  [R. 89, p. 7 (citing *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *20 (E.D. Mich. July 28, 2022))].  While *Won* does explain that witnesses employed by the parties may testify to "the proprietary peculiarities, jargon, and course of dealings under those processes," it does so in the context of explaining how an employee's experience with the company's technical processes qualified him to offer *expert testimony*, as do all the cases *Won* relies on.  *See Won*, 2022 WL 3010886, *20; *see also Cahoo v. Fast Enterprises LLC*, No. 17-10657, 2021 WL 1037727, at *7 (E.D. Mich. Mar. 18, 2021) (holding defendants' employees were qualified as experts based on their experience with defendant systems at issue); *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) (finding police officers could testify as experts about the drug trade based on their experience).  In this case, the Court will reiterate, Mr. Fairchild's experience with Rumpke does not make him qualified to testify to geotechnical engineering.  It certainly does not make such opinions lay opinions.

To the extent Terracon seeks to admit lay opinions of Mr. Fairchild, the Court will evaluate the situation in the context of trial.  But the Court will be "especially vigilant" should "Mr. Fairchild's testimony stray[] away from facts and veer[] into expert-opinion territory," as is Rumpke's concern.  [R. 95, p. 14 (quoting *White*, 492 F. 3d at 401)].  Terracon may not offer impermissible expert opinion on geotechnical engineering matters under the guide of lay opinion.

2.      **Terracon's Motion to Exclude the Testimony and Opinions of William T. Baldwin, Ph.D.**

The Court next considers Terracon's Motion to Exclude the Testimony and Opinions of Rumpke's damages expert, Dr. Baldwin.  [R. 85].  Before addressing Terracon's arguments, however, the Court finds it helpful to revisit certain aspects of the factual and procedural history of this case.

Through this action, Rumpke seeks to recover damages from Terracon for its claims of professional negligence, breach of contract, breach of warranties, and unjust enrichment relating to efforts to stabilize the West Berm at the Pendleton County Landfill.  *See* [R. 1].  Rumpke engaged Terracon in 2008 "for an analysis of the cracking issues at the Perimeter Berm and for recommendations about how to ensure the safety and stability of the Landfill."  *Id.* at ¶ 18.  On August 7, 2008, Terracon sent Rumpke a letter summarizing its preliminary analyses and identifying three potential remedial measures: (1) rebuild the existing slope; (2) install drilled pier walls; or (3) build a soil buttress.  [R. 1-2, pp. 2–3].  With regard to installing drilled pier walls, Terracon advised:

> A rough estimate of a 30-ft-deep pier wall about 300 feet long is about $110,000 per pier wall row based on the midslope location analyzed for this study.  Figure 4 shows the location analyzed.  Additional discussion and analyses are necessary to establish the locations of 2nd and 3rd pier walls but should be feasible.  Figures 5 and 6 show that additional walls would be required to stabilize the areas up and down slope from the middle pier wall.

*Id.* at 3.  Based on Terracon's "August 2008 Letter and January 2010 Letter and the analyses incorporated therein, Rumpke chose to proceed with regrading and reconstructing the lower part of the slope of the Perimeter Berm."  *See* [R. 1, ¶ 29].

In 2014, Rumpke again turned to Terracon for assistance after additional tension cracks occurred near the upper areas of the perimeter berm and additional creep movement of the

perimeter berm occurred.  *See id.* at ¶¶ 35–36.  In July 2015, Terracon provided Rumpke with an updated assessment of the perimeter berm, noting that it continued to experience minor tension cracks and creep movement.  *See, e.g.*, [R. 62, p. 9 (citing [R. 1-6])].  Terracon then proposed four remedial options: (1) build a soil buttress; (2) excavate/reconstruct the slope; (3) install stub piers; or (4) some combination of the first three options.  [R. 1-6, pp. 5–6].  While Rumpke was considering these options, Terracon provided an "Estimate of Probable Construction Cost" for "Repair with Stub Pier Construction."  [R. 84-3, p. 175].  The estimate was $990,625.00 and described the option as follows:

> Stub Pier wall to be approximately 675 feet long with construction of 25-ft-wide working bench at approximate Elevation 670 ft and 35-ft-long stub piers at approximately Elevation 638 ft to Tip Elevation of 628 ft – drilled length = 42 feet, reinforced concrete for bottom 35 feet only.

*Id.*

At that time, Rumpke elected to construct a buttress fill.  *See* [R. 1, ¶ 44].  However, when cracking began in 2018, Rumpke terminated the project.  *See id.* at ¶ 60.  Rumpke then "hired another geotechnical engineer and construction company to install drilled pier walls at the Landfill."  *Id.* at ¶ 75.  That company was CSA, and according to the "Final Cost Breakdown" spreadsheet produced by CSA, the actual cost of the completed CSA project was $3,486,292.24. *See* [R. 85-1, p. 55].

Through this litigation, Rumpke maintains that installation of the drilled pier walls was the only option that Terracon should have offered when there had been issues on the perimeter berm. *See, e.g.*, [R. 92, p. 3 ("Had Terracon acted in accordance with the standard of care, Terracon would have (and should have) concluded that there was only one viable remedial measure all along: the installation of drilled pier walls.")].  Thus, it seeks to recoup as damages the additional costs it sustained by the stabilization project being completed around 2019 rather than earlier.  *See,*

*e.g.*, *id.* ("And had drilled pier walls been installed either in 2010 when the slope was rebuilt or in 2015 when the soil-buttress project was recommended, the Perimeter Berm would not have experienced the significant lateral movement that occurred in December 2018, the installation of drilled pier walls would have cost much less, and Rumpke would not have suffered over \$2 million in damages."); [R. 85, p. 2 ("Rumpke now contends that if Terracon had recommended the installation of drilled pier walls in 2008, to the exclusion of any other remedial measure, then Rumpke would have installed drilled pier walls in 2010, and the slope stability issues would have been permanently resolved.  As a result, Rumpke asserts a claim for damages based on the higher cost of installing drilled pier walls in 2019 as compared to the hypothetical, guesstimated cost of completing the same project in 2010.") (internal footnote omitted)].

Rumpke first disclosed Dr. Baldwin as an expert witness on July 26, 2021, and Dr. Baldwin's report disclosed at that time stated that its purpose was "to estimate the additional costs sustained due to the West Berm Stabilization project being completed in and around 2019 rather than in and around year 2010."  *See* [R. 35-2, p. 2].  In that report, Dr. Baldwin acknowledged that the projected additional cost in the report was "an approximation given that: (1) U.S. producer commodity price indexes and hourly earnings only for years 2010 and 2019 [were] compared, (2) 'construction sand/gravel/crushed stone' [was] used to represent all materials utilized and labor [was] represented by all construction employees, and (3) only materials and labor costs [were] addressed."  *Id.*  Using this methodology, Dr. Baldwin estimated that the additional costs came to \$431,398.  *Id.* at p. 3.

Following some discovery, Rumpke provided another report of Dr. Baldwin on March 18, 2022.  *See* [R. 52-2].  At that time, Dr. Baldwin's report stated:

> I previously prepared a report dated July 21, 2021 which estimates the additional costs sustained due to the West Berm Stabilization project being completed in and

around 2019 rather than in and around year 2010.  This project, which entailed the construction of an 812-foot-long stub pier wall, revolved around the West Berm slope stability analyses and recommendations prepared by Terracon Consultants, Inc. (formerly known as H.C. Nutting) for the Rumpke Waste and Recycling Services Pendleton County Landfill.  My July 21 report focused on only two cost components: labor and materials.  Based on information available to me at that time and statistical data I consulted (and referenced in the report), the additional cost incurred due to the delay in carrying out the project was projected to be $431,398, the total of excess materials costs equal to $328,928 and excess labor costs amounting to $102,470.

More comprehensive projections of the additional costs incurred due to the delay in carrying out the project are made in this supplemental report based on information received subsequent to the preparation of my July 21, 2021 report.  This new information consists of two separate estimates from earlier years for the entire cost of constructing the pier wall.  These costs are compared with the total construction cost of $3,486,292.24 incurred when the project was finally completed around 2019.

*Id.* at 29.

Dr. Baldwin then listed two projections for damages for Rumpke based on the delay in building the pier wall, one using an estimate Terracon had provided in 2008 for the stud pier option and one using the estimate Terracon had provided in 2015 for such an option.  *See id.* at 29–30.

Dr. Baldwin's projections read:

### Projection 1

In an August 7, 2008 letter addressed to William P. Fairchild at Rumpke of Knetucky [sic], a cost estimate for constructing the pier wall was provided by two Senior Principals at H.C. Nutting (Ronald J. Ebelhar and George C. Webb).  With the project likely requiring 3 rows of piers at a cost of $110,000 per row, the estimated cost was $330,000 for a 300-foot-long pier wall Dividing $330,000 by 300 feet yields a cost of $1,100 per foot.  Applying the per foot cost of $1,100 to the 812-foot-long wall that was eventually needed, the 2008 cost of constructing an 812-foot-long wall is $893,200:

$$\$1,100 \text{ per foot x } 812 \text{ feet} = \$893,200$$

With the total construction cost for an 812-foot-long pier wall around 2019 being $3,486,292 (rounded to the nearest dollar), the additional cost incurred due to the delay in carrying out the project is estimated to be $2,593,092:

**Additional Cost: $3,486,292 - $893,200 = $2,593,092**

*Projection 2*

Attached to a September 4, 2015 e-mail message to William P. Fairchild at Rumpke from Ron J. Ebelhar at Terracon was a cost estimate of $990,625 for the construction of a stub pier wall with a projected length at that time of 675 feet. Dividing $990,625 by 675 feet yields a cost of $1,467.59 per foot. Applying the per foot cost of $1,467.59 to the 812-foot-long wall that was eventually needed, the 2015 cost of constructing an 812-foot-long wall is $1,191,685 (rounded to the nearest dollar):

$1,467.59 per foot x 812 feet = $1,191,685

With the total construction cost for an 812-foot-long pier wall around 2019 being $3,486,292, the additional cost incurred due to the delay in carrying out the project is estimated to be $2,294,607:

**Additional Cost: $3,486,292 - $1,191,685 = $2,294,607**

*Id.*

On June 16, 2022, Rumpke disclosed Dr. Baldwin's rebuttal report to Terracon's damages expert. *See* [R. 56-2]. In his rebuttal report, Dr. Baldwin addressed several criticisms by Terracon's expert, including that Dr. Baldwin had changed his methodology from the June 2021 report to the October 2021 report. *See id.* at 3–4. Here, Dr. Baldwin explained that the June 2021 report had used national prices indices because, "[a]t that time, there were no estimates available of what it would have cost to construct the pier wall during an earlier year," so:

In lieu of having such estimates, I used national price indices for the cost of materials and the cost of labor between 2010 and 2019 in conjunction with the project-specific 2019-20 materials and labor costs to arrive at an estimate of what the pier wall construction materials and labor costs would have been in 2010. The price indices were not specific to the project and using these indices to arrive at how much the project would have cost in 2010 yielded only an estimate, based on the information available to me in July 2021.

*Id.* at 3. Dr. Baldwin further explained that, "[d]uring discovery, document productions and deposition testimony uncovered two estimates made by Terracon Consultants, Inc., one in 2008

and one in 2015, of what it would have cost to construct the pier wall at earlier points in time," thus he "adjusted these cost estimates to account for the pier wall ultimately constructed in 2019, which differed in length from what was assumed in the cost estimates." *Id.* at 4.  He also stated that "[t]estimony and documentary evidence support[ed] [his] reliance on Terracon's 2015 pier wall construction estimate." *See id.* at 6.

Through its motion, Terracon challenges Dr. Baldwin as an expert witness on all three grounds under Rule 702 and *Daubert*: (1) qualifications; (2) relevance; and (3) reliability.  *See* [R. 85]; *see also In re Scrap Metal*, 527 F.3d at 528–29.  The Court will address each of these arguments in turn.

*Qualifications*. First, Terracon argues that "Dr. Baldwin is not qualified to offer expert opinions regarding construction cost estimates or regarding the actual construction costs incurred by Rumpke."  [R. 85, p. 3].  In this context, Terracon argues that: (1) Dr. Baldwin "has no knowledge, experience, or training in estimating construction costs or in construction projects in general, and, therefore, he cannot opine on the cost of a pier wall in 2010 or the reasonable cost of a pier wall in 2019;" and (2) he is unqualified "to opine that the two different pier wall concepts proposed by Terracon in 2008 and 2015 – the estimates he relies on to support his damage calculation – are in any way similar to the pier walls that CSA later designed and that were installed in 2019." *Id.*

However, as Rumpke argues, it "is common practice for financial and economic experts who usually have no experience in the underlying subject matter of the litigation" to rely on other experts who do have such knowledge. *See Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.,* No. 3:16-CV-00024, 2022 WL 4016894, at *6 (W.D. Ky. Sept. 2, 2022).  Thus, even when discussing damages experts, courts have explained that "[t]o be qualified as an expert witness

under Rule 702, an expert need not be a blue-ribbon practitioner with optimal qualifications or have an intimate level of familiarity with every component of a [project] as a prerequisite to offering expert testimony." *Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077, 2020 WL 6331092, at *2 (W.D. Ky. Oct. 28, 2020) (quoting *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 387–88 (W.D. Ky 2018) (cleaned up)) (discussing damages expert plaintiffs had retained to determine whether defendant's actions had "adversely affected competition and to assess their damages"). In the context of a damages expert, the *Morris* court noted that "experts need not even have direct experience with the precise subject matter of the product at issue." *Id.*

It is true that Dr. Baldwin is not an expert in "construction costs" or in "construction projects," but he does have extensive knowledge and experience in the field of economics.[12] *See* [R. 52-2, pp. 5–27] (Dr. Baldwin's Curriculum Vitae); *see also Morris*, 2022 WL 6331092, at *2 ("While [witness's] experience with the [litigation's] industry may be lacking, [he] does have significant experience in economics."). Indeed, his undergraduate work was in commerce (accounting major, economics minor), his master's degree was in economics, as was his Ph.D., and he completed post-doctoral work in finance. *See* [R. 52-2, p. 5]. He also taught economics and business administration at colleges/universities in Kentucky for more than forty years. *See id.* Additionally, from 1975 to the present, he has worked as a consulting economist for plaintiffs and defendants, and, in that role, has prepared more than "1,000 reports since 1986 that involve estimates of the destruction of earning capacity in wrongful death and personal injury cases,

---

[12] In its motion, Terracon relies on a footnote from *Imperial Park, LLC v. Penn-Star Ins. Co.*, No. 3:14-CV-609, 2015 WL 7015574, at *10 n.24 (M.D. Tenn. Nov. 10, 2015), to argue Dr. Baldwin is unqualified because he lacks experience or training relating to construction bids. *See* [R. 85, pp. 9–10]. But as *Rumpke* notes in its response, the court's footnote in *Imperial Park* was in the context of explaining that a lay witness (a co-owner of the plaintiff) could not also testify as an expert on certain topics when he lacked the expertise to do so. *See* [R. 92, p. 8]. That case therefore is inapposite.

commercial damages, and of losses sustained by individuals as a result of discrimination/termination, including about 210 court appearances as an economic expert witness." *Id.* at 6. He has also authored numerous publications. *See id.* at 6–10.

On this record, the Court is satisfied that Dr. Baldwin is qualified to opine on damages in this action based on his knowledge, skill, experience, training, and education, and this is true despite his lack of "industry-specific training" for construction projects. Fed. R. Evid. 702; *see also Advanced Drainage Sys., Inc. v. Quality Culvert, Inc.,* No. 2:12-1121, 2015 WL 1299368, at *6 (S.D. Ohio Mar. 23, 2015) (citing *Regal Cinemas, Inc. v. W & M Props.,* 90 F. App'x 824, 833 (6th Cir. 2004)) ("Regarding [the qualification] requirement, Defendants argue only that [the witness] has no expertise specifically regarding the market for [the] products. However, a damages expert need not have that type of industry-specific training."); *cf. Cheetham v. Woolrich, Inc.,* No. 5:07-CV-434, 2009 WL 2913645, at *2 (E.D. Ky. Feb. 2, 2009) (discussing Dr. Baldwin's "knowledge, skill, experience and training" and finding they "clearly qualify him as a forensic economist to opine regarding lost earnings"). As other courts have found, any concerns a defendant (here, Terracon) has regarding an expert's experience "are best suited for cross-examination." *Morris*, 2020 WL 6331092 at *2; *see also Cheetham*, 2009 WL 2913645, *2 ("The issues raised by [the opposing party] may be appropriate for cross examination regarding credibility, but they do not warrant a hearing on Dr. Baldwin's qualifications or the reliability of his analysis.").

The Court next addresses Terracon's argument that Dr. Baldwin is unqualified "to opine that the two different pier wall concepts proposed by Terracon in 2008 and 2015 – the estimates he relies on to support his damage calculation – are in any way similar to the pier walls that CSA later designed and that were installed in 2019." *See* [R. 85, p. 3]. Clearly, it would be improper

for Dr. Baldwin to opine on any differences between the pier wall concepts since his specialty is economics and not geotechnical engineering. *See Morris*, 2020 WL 6331092, at *2 ("To the extent there are weaknesses in [the witness'] qualifications to testify about a topic [outside the scope of his expertise], cross-examination is the appropriate time to address those weaknesses. [The expert], however, will not be able to testify to [industry]-related opinions that have no relation to his ultimate conclusions."). But Terracon's assertion that the wall pier options were different strikes the Court as a challenge to the accuracy of the information Dr. Baldwin relied upon (and ultimately to Dr. Baldwin's opinions), which is different than challenging Dr. Baldwin's qualifications. Because the Court finds Dr. Baldwin is qualified, it moves on to consider the other grounds on which Terracon seeks to exclude his testimony.

*Relevance.* Second, Terracon argues that "although expert testimony is required to support Rumpke's damage claim, the opinions offered by Dr. Baldwin are not relevant because they are not helpful to the jury." [R. 85, p. 4]. In this context, Terracon argues that

> [e]ven if Dr. Baldwin's methodology of comparing the actual, all-in costs of the completed 2019 pier walls to Terracon's back-of-the-napkin estimates for pier wall concepts that Rumpke chose not to implement in 2008 and 2015 was reliable (it is not), the jury is capable of performing that basic arithmetic without the assistance of expert testimony.

*Id.*

"In terms of relevancy, the trial court should consider whether that [expert's] reasoning and methodology properly can be applied to the facts at issue." *Savidge v. Pharm-Save, Inc.*, No. 3:17-CV-186, 2023 WL 2755305, at *20 (W.D. Ky. Mar. 31, 2023) (cleaned up). "The trial court must ensure that the proposed expert testimony is relevant to the task at hand and that there is a proper fit between the inquiry in the case and the testimony." *Id.* (internal quotation omitted). "Expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful." *Id.* (quoting *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993)) (cleaned up).

Moreover, "[u]nhelpful expert testimony creates the danger that a jury may unnecessarily defer to the judgment of a highly credentialed expert, when in fact the law considers lay jurors just as capable." *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 12748012, at *1 (N.D. Ohio July 16, 2015) (citing *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1340 (11th Cir. 2012) ("[W]hen jurors need no assistance to understand the fact at issue, the expert's testimony [on the same facts] may lend undue credence to one party's view of the facts because that testimony bears the imprimatur of an expert.")).

In its motion, Terracon chides Dr. Baldwin for using "basic math" to arrive at his projections and argues that his opinions are unhelpful to a jury because a jury could perform such calculations its own. *See* [R. 85, p. 12]. Here, it is true that courts have found "basic math" arguments persuasive and granted motions to exclude on such grounds. *See, e.g.*, *Advanced Drainage Sys.*, 2015 WL 1299368, at *8 (collecting cases); *Ray v. AT&T Mobility LLC*, No. 2:17-CV-68, 2020 WL 535787 (E.D. Ky. Feb. 3, 2020); *In re Connolly N. Am., LLC*, 398 B.R. 564, 576 (Bankr. E.D. Mich. 2008) ("Simple addition and division does not qualify as 'scientific, technical, or other specialized knowledge.'"). However, as with many evidentiary issues, still other courts have come out the other way and permitted "simple math" expert testimony. *See, e.g.*, *Crouch v. John Jewell Aircraft*, *Inc.*, No. 3:07-CV-638, 2016 WL 157464, at *13 (W.D. Ky. Jan. 12, 2016) (rejecting argument that expert testimony is "unnecessary because the jury, should it award damages, can do simple math.").

For example, in *Ray*, a defendant sought to exclude an expert's opinion calculating the plaintiff's entitled FMLA leave time. *Ray*, 2020 WL 535787, at *6. The proposed opinion involved calculating the "average weekly work/leave hours" by adding together hours worked over

52 weeks and dividing by 52 before multiplying the number of weeks plaintiff claimed they were entitled to leave. *Id.* at *7. The Court held that the expert's

> computation involves basic math and thus violates the principle that an expert's testimony must involve "specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). It is well established that "expert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic." In other words, if "the subject matter is not complex or technical" expert testimony is not necessary.
>
> The lay jury is endowed with the common knowledge necessary to add, divide, and multiply the figures presented by the parties without "expert" testimony.

*Id.* (first quoting 29 Charles Allan Wright et al., *Federal Practice & Procedure* § 6265.2 (2d ed., West 2018 update); then quoting *Stromback v. New Line Cinema*, 384 F.3d 283, 295 (6th Cir. 2004)) (internal citations omitted).

Recognizing that each case must be considered on its own merits, the Court finds the reasoning of *Ray* most persuasive to the circumstances of this case. Like the expert in *Ray* who merely calculated averages, Dr. Baldwin's calculation is relatively straight-forward—he simply used Terracon's cost estimates and found the cost per foot to build the wall at each point in time and multiplied it by the ultimate length of the wall constructed in 2019 and compared those prices to the price ultimately paid by Rumpke. *See id.*; [R. 56-2, pp. 29–30]. The lay jury need only "add, divide, and multiply the figures presented by the parties," which the *Ray* court found to be "common knowledge." *Ray*, 2020 WL 535787, at *7. Dr. Baldwin himself has stated that

> A. I don't think that expertise was probably needed for some of the simplistic calculations here. I think it was needed for the first Projection . . . And given that I was aboard and able to answer questions . . . I was retained to go forward with these, I guess, easier, less sophisticated Projections.
> ***
> Q. You don't need to be an economist to divide 990 by 675; do you?
> A. I think others could do that
> . . .
> Q. Simplistic mathematical equation, right?

    A.  I agree with that
    Q.  Elementary school mathematical equation?
    A.  Some elementary students could, some maybe not.
    . . .
    Q.  You don't need to be an economist to [subtract the calculated 2015 price from
    the 2019 actual price], do you?
    A.  Others could make that calculation; I would agree.

[R 84-3, pp. 26, 34 (Baldwin Dep. 100:20–101:2, 130:8–12, 130:24–131:8, 131:17–21) (objections omitted)].

Dr. Baldwin performed no "independent analysis" and used evidence that will be readily available to the jury.  *Cf. Advanced Drainage Sys.*, 2015 WL 1299368, at *8 (excluding expert from testifying on lost profits when her "basic math" analysis "contain[ed] no independent analysis which [she] [was] specifically qualified for"); *Arnold v. Ambulance Serv. of Bristol, Inc.,* No. 2:06-CV-105, 2007 WL 5117409, at *1 (E.D. Tenn. Aug. 21, 2007) (allowing a lost earnings expert to testify over the defendant's "simple math" objection when the expert had completed at least seven calculations, evaluated a variety of scenarios, and "[e]ssentially. . . performed an audit on Defendant's payroll records and . . . [gave] his professional accounting opinion as to what that audit show[ed]." (quoting Memo. in Opp. to Defs.' Motion to Exclude Expert Op. Testimony & Rep. of Tommy Greer, C.P.A., *Arnold*, 2007 WL 5117409, 2007 WL 4903154 (Aug. 17, 2007)).

Moreover, unlike the experts in the cases relied upon by Rumpke, who were permitted to testify about so-called 'basic math' in addition to other opinions, Dr. Baldwin would exclusively testify to his calculations.  *See* [R. 92, p. 9]; *cf. Crouch*, 2016 WL 157464, at *11–13; *Burris v. Ethicon, Inc.*, No. 3:20 CV 1450, 2021 WL 3190747, at *18 (N.D. Ohio July 28, 2021).  The expert in *Crouch*, whose lost-income testimony the defendants objected to because it did not require specialized knowledge, testified to more than just his calculations of the plaintiffs' lost income post-injury.  *See Crouch*, 2016 WL 157464, at *11–13.  The calculations of the lost income— simply multiplying the plaintiffs' yearly salaries by years not worked—were fairly

straightforward.  *Id.* at *13.  However, the lost-income calculations were related to other testimony the expert would offer, including opinions regarding the plaintiff's "vocational history and their ability to re-enter the labor market post-injury," which he determined after completing in-depth evaluations of their credentials, employment history, and the nature of their injury.  *See id.* at *11.

Similarly, the court in *Burris* allowed a lost-earnings expert to testify over the defendants' contention that the witness's calculation was a "common-sense estimate," when the witness's calculation involved multiplying the plaintiff's salary by years worked.  *Burris*, 2021 WL 3190747, at *18.  The court found that "[a]lthough the resulting calculation may be a simple one, it is connected to [expert's] expertise and explanation regarding his opinion that Plaintiff cannot work, and that her prior job salary was her pre-injury earning capacity."  *Id.*  Dr. Baldwin's proffered testimony, by comparison, offers no connected opinions and consists of only his simple damages calculation.

Other than asserting it to be so, Rumpke has not demonstrated how Dr. Baldwin "will help the trier of fact to understand the evidence" made up of simple math.  *See* Fed. R. Evid. 702; [R. 92, p. 9].  Dr. Baldwin himself admits that he doesn't "think expertise was probably needed for some of the simplistic calculations here," [R. 84-3, p. 26 (Baldwin Dep. 100:20–22))], and he does "think others could do" the math, *id.* at p. 34 (131:11–12).  Thus, while the Court finds Dr. Baldwin is qualified in the area of economics and as a damages expert generally, his opinions in this specific case and in the context of Rumpke's damages theory are irrelevant and should be excluded on such grounds.[13]  In other words, "the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or

---

[13] Given that Rumpke asserts that Dr. Baldwin's second report, of March 18, 2022, replaces his initial report of July 26, 2021, the Court does not address Dr. Baldwin's original, 2021, opinions.  *See* [R. 85, pp. 5-6 n.4 (referencing [R.52])].

*simple logic*." *Ray*, 2020 WL 535787, at *7 (citations omitted) (emphasis in original). By excluding Dr. Baldwin's testimony to his calculation, the Court addresses the significant concern in *In re Polyurethane*, that "when jurors need no assistance . . . [an] expert's testimony on the same facts may lend undue credence . . . because the testimony bears the imprimatur of an expert." 2015 WL 12748012, at *1 (quoting *Rosenfeld*, 682 F.3d at 1340) (cleaned up).

This does not mean that the evidence Rumpke seeks to admit concerning its theory of damages is inadmissible. Rumpke's damages theory appears straightforward: had the pier wall been constructed based on the 2008 or 2015 concepts, it costs would have been less than it ultimately paid in 2019, and its resulting damages are the differences between the 2008 and 2015 estimates and the final cost in 2019, adjusted for length. As the Court has found, the presentation of such calculations does not require specialized training or skill. Accordingly, a lay witness with personal knowledge of the various proposals and the pier wall ultimately installed in 2019 could present this evidence. Further, if Rumpke has concerns about the jury's ability to use the evidence to reach a damages amount, "Rule 1006 expressly permits a party to 'use a summary, chart, or *calculation* to prove the content of voluminous writings.'" *Ray*, 2020 WL 535787, at *8 (citing Fed. R. Evid. 1006) (emphasis in original). Lastly, Terracon may address its concerns about the dissimilarity of the earlier estimates and the final pier wall through vigorous cross-examination. *See infra* Section IV(B).

Thus, the Court finds Dr. Baldwin's opinions are irrelevant and should be excluded on such grounds. Terracon also argues that "Dr. Baldwin's opinions are unreliable." [R. 85, p. 4]. However, the Court need not reach this issue and declines to do so now.

### 3.   Terracon's Motion to Exclude the Testimony and Opinions of B. Michael Yacyshyn

Last concerning evidentiary motions, Terracon has moved to exclude the testimony and opinions of B. Michael Yacyshyn, Rumpke's liability expert.  [R. 86].  As with Terracon's motion to exclude Dr. Baldwin above, a brief detour to discuss Mr. Yacyshyn's reports and opinions provides helpful context to Terracon's arguments.

Through each of its remaining claims in this action, Rumpke maintains that Terracon breached the professional standard of care Terracon owed to Rumpke.  *See, e.g.*, [R. 1, ¶ 81 (Professional negligence claim: "In performing services for Rumpke, H.C. Nutting/Terracon owed a duty to Rumpke to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances")]; *id.* at ¶¶ 94–95 (Breach of warranties claim: "As described above, H.C. Nutting/Terracon breached these representations by failing to perform their services in a quality, professional and workmanlike manner, free from defects and fit for its intended purpose.  As a direct and proximate result of H.C. Nutting/Terracon's breaches of these express and implied warranties, Rumpke has incurred damages, in an amount exceeding this Court's jurisdictional limit."); *id.* at ¶ 100 (Breach of contract claim: "Terracon's failure to provide adequate services to Rumpke constitutes a breach of contract, as a result of which Rumpke has been damaged."); *id.* at ¶¶ 105–07 (Unjust enrichment claim: "H.C. Nutting/Terracon did not meet the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances in their provision of subsurface investigation/laboratory testing, geotechnical design/analysis, and construction details and implementations services to Rumpke. H.C. Nutting/Terracon's provision of services caused Rumpke substantial damages.  Under these circumstances, it would be unjust for H.C. Nutting/Terracon to retain payments Rumpke made to H.C. Nutting/Terracon.").  Rumpke has hired Mr. Yacyshyn as an expert witness to opine on the

professional standard of care owed by a geotechnical firm. *See, e.g.*, [R. 35, p. 1 (Rumpke's initial expert disclosures)]; [R. 35-1(for ease of reference, the Court will refer to the report of Mr. Yacyshyn, Heyerly, and/or Eith as the "CEC report")].

Rumpke disclosed first disclosed CEC's report on July 26, 2021. *See* [R. 35-1]. The report offered opinions on "Subsurface Investigation / Laboratory Testing," "Geotechnical Design / Analysis," and "Construction Details & Implementation" and concluded:

> In performing services for Rumpke related to the West Berm stabilization, from 2008 through 2018, Terracon/HCN failed to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances. As set forth above, the only viable remedial measure, in both 2008 and 2015, was Alternative 2 – Drilled Pier Walls. Had Terracon performed a comprehensive geotechnical exploration to confirm their assumptions, including laboratory testing to establish residual soil strengths, Terracon's analysis should have concluded and recommended Alternative 2 – Drilled Pier Walls as either a stand-alone remedial measure or a measure that would be used in conjunction with other concepts. Had a drilled pier wall or walls been installed in 2010/2011, on-going instability of the West Berm would have been prevented.

*Id.* at pp. 16–21.

After the parties had begun exchanging discovery, Rumpke disclosed another report by CEC on March 18, 2022. *See* [R. 52-1]. This report again offered opinions on "Subsurface Investigation / Laboratory Testing," "Geotechnical Design / Analysis" (this time specifically including discussion of 401 KAR 48:080 regarding factors of safety), and "Construction Details & Implementation." *Id.* at 17–22. The March 18, 2022, report offered the same conclusion as the July 26, 2021, report. *Id.* at 22.

On June 17, 2022, Rumpke disclosed CEC's rebuttal report. *See* [R. 56-1]. That report responded to six conclusions of Terracon's expert witness (Siegel of Dan Brown and Associates PC ("DBA")) and, relevant here, disputes the assertion that Terracon was permitted to rely on a permit it had obtained for groundwater wells in 2010. *Id.* at 2–3. In responding to DBA's

conclusion that "Terracon's Use of an Appropriate Design Factor-of-Safety is Evidenced by the Approval of the Applicable Permit Modification," the CEC's rebuttal report states

> In support of Conclusion 1, DBA cites only Rumpke's January 27, 2010 Response to Notice of Deficiency submitted to the Kentucky Energy and Environment Cabinet, Department for Environmental Protection, Division of Waste Management. The permit modification subsequently approved on May 7, 2010, related to APE 20090004, Solid Waste Permit #096-00001, was limited to abandonment and replacement of groundwater wells, and makes no reference to and does not indicate that Kentucky State regulators approved Terracon's design modifications or the slope stability analysis for the West Berm.

> Even if there was regulatory approval, an approval by Kentucky State regulators does not negate Terracon's (formerly H. C. Nutting Engineers – Cincinnati) professional obligation to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances, or Terracon's obligation to properly follow and apply the state regulations that require a minimum factor-of-safety of 2.0 for the subbase (401 KAR 48:080 Section 10). The West Berm supports the liner system and thus is considered a subbase. Relying solely on regulatory approval instead of exercising the required degree of care and skill of a reasonably competent geotechnical engineer, and complying with the regulation requirements, puts the owner/applicant at undue risk and does not satisfy the Standard of Care.

*Id.* at 3.

Terracon now moves to "exclude all of Mr. Yacyshyn's testimony and opinions on Terracon's alleged breaches of the standard of care as well as his opinions on causation because his opinions are not relevant and not reliable." [R. 86, p. 3]. Terracon characterizes Mr. Yacyshyn as having opined that: (1) "Terracon breached the standard of care by relying on back-calculations instead of laboratory testing to determine the residual strength of the existing fill material on the West Berm"; and (2) "Terracon breached the standard of care by using an insufficient factor of safety in its analyses." [14]   *Id.* at 2 (internal footnotes omitted).

---

[14] In its response, Rumpke submits that CEC's reports contain more than two opinions, *see*, [R. 93, pp. 3–4], which Terracon dismisses by arguing that "all of Mr. Yacyshyn's alleged 'multitude' of opinions are actually nothing more than different ways of restating his two overarching opinions: 1) criticism of Terracon's reliance on back-calculations to determine the residual soil strength and

Through its briefing, Terracon offers various arguments for why each of these opinions should be excluded.  However, the Court observes that Terracon has *not* argued that Mr. Yacyshyn is unqualified to offer his opinions.  Further, besides providing passing reference to the word "relevant" in its briefing, Terracon has not argued there is no "fit" between Yacyshyn's opinions and the issues in this case.  Therefore, the Court views each of Terracon's arguments in favor of excluding Mr. Yacyshyn's opinions to challenge the *reliability* of such opinions rather than his qualifications or the relevancy of what he has offered.

Case law directs that the inquiry into an expert's reliability "is a flexible one, and the focus must be solely on principles and methodology, not on the conclusions they generate."  *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 594–95) (cleaned up); *see also Kumho Tire*, 526 U.S. at 141 ("But, as the Court stated in *Daubert,* the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.").  "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Newell Rubbermaid*, 676 F.3d at 527; *see also Lawrence v. Raymond Corp.*, No. 3:09 CV 1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011), *aff'd*, 501 F. App'x 515 (6th Cir. 2012) ("An expert is not a black box into which data is fed at one end and from which an answer emerges at the other; the Court must be able to see the mechanisms in order to determine if they are reliable and helpful.").  Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

---

2) Terracon's use of a factor of safety of less than 2.0," *see* [R. 96, p. 2].  Because the Court finds that none of Mr. Yacyshyn's opinions that Terracon challenges should be excluded, it does not need to quantify the number of opinions Mr. Yacyshyn offers.

the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

**a.     Terracon's Motion to Exclude Mr. Yacyshyn's Opinion Related to Back-Calculations and Laboratory Testing**

First, Terracon argues that "[t]he Court should exclude Mr. Yacyshyn's opinion that Terracon breached the standard of care by relying on back-calculations."[15] [R. 86, p. 7].  As factual background for these arguments, recall that when Terracon sent Rumpke potential remedial measures in 2008, it informed Rumpke that its assumptions and proposed remedial measures were "based on limited data and may not be representative of the actual conditions on the slope" and that "[t]o confirm these assumptions and the analysis supporting the remedial measures, a geotechnical exploration should be conducted." [R. 1-2, p. 3].  No geotechnical exploration was ever performed, and instead of any sort of laboratory testing, Terracon used back-calculations to estimate soil parameters.  *See, e.g.*, [R. 93, p. 6].

Citing these facts, Rumpke submits that "Terracon's failure to verify its assumptions and its decision to instead rely on back-calculations resulted in Terracon recommending inappropriate, ineffective, and improper remedial measures to Rumpke both in 2008 and 2015" and that "Mr. Yacyshyn opined that these actions constitute a breach of the standard of care by Terracon."  *Id.* Terracon now challenges this opinion as (1) being too speculative; (2) being contrary to other evidence in the record; and (3) inadequately supporting Rumpke's theory of causation.  [R. 86, pp. 7–16].

---

[15] Terracon defines "[t]he back-calculation [as] an accepted methodology that is used by geotechnical engineers to determine slope stability and to develop landslide remedial measures." [R. 86, p. 2 n.1 (citing [R. 55-1, p. 10])].

*Speculation*.  For its first reliability argument in this context, Terracon maintains that Mr. Yacyshyn's opinion that testing was even possible is too speculative to be reliable and faults him (and CEC) for not conducting any laboratory testing on his (or its) own.  *See id.* at 7–10.

To the first point, Rumpke responds that "Mr. Yacyshyn's opinion regarding the ability to conduct laboratory testing is based on facts and data in the record, as well as his own experience—all permissible foundations for his opinion."  [R. 93, p. 8].  The response continues:

> By way of example, in his Rebuttal Expert Report, Mr. Yacyshyn noted that the boring logs and test pits—i.e., data, evidence, and facts in the record—reveal the presence of lean clay and shale fill in the area, and, along with the corresponding blow counts, lead him to conclude that: "High quality Shelby tube samples should have been obtained in these soils, then subjected to appropriate laboratory sheer strength testing.  The resulting testing stability analyses would have been more reliable than analysis using back-calculated strengths."   At his deposition, Mr. [Yacyshyn] expounded on the foundation for his opinion:
>
> > Q.  So how do you know it was possible to do a test pit and then drive or push a Shelby tube in?
> >
> > A.  Based on the review of the logs.  There were test pit logs.
> >
> > Q.  Terracon's test pit logs?
> >
> > A.  Correct.
> >
> > Q.  Okay.  And what in those test pit logs told you that test pits with Shelby tubes were possible?
> >
> > A.  The description of the soils that they encountered.
> >
> > ***
> >
> > Q.  Are you assuming for purposes of your report that testing was possible?
> >
> > A.  Yes.
> >
> > Q.  Did counsel ask you to make that assumption?
> >
> > A.  No.

Q. How did you make that assumption?

A. Professional judgment.

Q. Based on what?  That was the samples you talked about before, the boring logs?

A. Boring logs and test pits and experience in similar situations.

*Id.* (quoting [R. 56-1, p. 4]; [R. 84-2, pp. 26, 28 (Yacyshyn Dep. at 98:10–21, 108:7–18)]).

On this record, the Court does not view Mr. Yacyshyn's opinions as being too speculative. Instead, as Rumpke argues, Mr. Yacyshyn relied on the facts and data of this case and viewed them through the lens of his decades of experience as a geotechnical engineer to reach his conclusion; the law permits such an approach.  *See, e.g.*, *Cook v. Erie Ins. Co.*, 478 F. Supp. 3d 658, 666 (S.D. Ohio 2020) ("The Sixth Circuit has acknowledged that in certain fields, 'experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.'") (citing *Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir. 2005)). *cf. Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty.  And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.") (internal citations omitted).  "An expert is required," as Mr. Yacyshyn has, "to explain how [their] experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts.'"  *See Cook*, 478 F. Supp. 3d at 666 (quoting *Thomas*, 398 F.3d at 432); [R. 84-2, pp. 26, 28 (Yacyshyn Dep. at 98:10–21, 108:7–18) (quoted above)]; *id.* at 119 (Yacyshyn's CV) ("Mr. Yacyshyn has almost 44 years of experience in geotechnical engineering, landfill design, consulting, and contracting. . . [His] experience also includes all aspects of landfill design, including slope stability, settlement, [etc.].").

To the second point, case law does not require that experts perform their own testing.  *See Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405, 2022 WL 710174, at *21 (E.D. Ky. Mar. 9, 2022) ("However, an expert is not required to conduct his own testing because he may base an opinion on facts or data in a case that he has been made aware of or personally observed.") (cleaned up).  This is not to say that lack of testing is *never* relevant to a reliability inquiry.  *See generally Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146, 2023 WL 2730264, at *7–8 (W.D. Ky. Mar. 30, 2023), *amended*, No. 1:19-CV-00146, 2023 WL 3854266 (W.D. Ky. June 6, 2023) (products liability case); *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (products liability case); *cf. Crouch*, 2016 WL 157464, at *3 ("[A]lthough testing is always desirable, testing is not a prerequisite to admissibility.") (internal quotation marks omitted).  Rather, it is to say that, in this case, Rumpke has carried its burden to show that Mr. Yacyshyn's opinions are sufficiently reliable to avoid exclusion, even though he did not perform his own laboratory testing, because his opinions were developed through his review of facts and data in the record and his professional experience.  *See Mod. Holdings*, 2022 WL 710174, at *21 ("An expert may base his opinion on his experience, knowledge, and education.") (internal quotation marks omitted).

Terracon's counsel may properly inquire into the facts and data Mr. Yacyshyn relied on to support his opinions (for example, whether Kentucky soil is somehow different than other soil), but his testimony and opinions are not excludable on "speculative" grounds.  *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded.  Rather, it is up to opposing counsel to inquire into the expert's factual basis.") (internal citations omitted).

*Conflicts with Record.*  Next, Terracon argues that Mr. Yacyshyn's opinion that testing was possible ignores unhelpful facts in the record, including that Rumpke would not authorize testing in 2008 and that testing was not possible in 2014 or later when CSA did install pier walls in 2019. *See* [R. 86, pp. 10–12].  This argument deserves little discussion.

For one, CEC's rebuttal report *did* consider the possibility that Rumpke may not have authorized such testing in 2008:

> There are no documents supporting DBA's reliance on Rob Ebelhar's deposition testimony stating that Rumpke did not authorize the complete geotechnical study recommended by Terracon.  Further, even if Rumpke did not authorize the geotechnical study recommended by Terracon, Terracon, at a minimum, should have documented this in an email or letter to Rumpke.  Because the complete geotechnical study would have provided new information critical to the analysis and design of the viable remedial options, Terracon could have declined the assignment given the risk of continuing without the necessary field and laboratory information.

[R. 56-1, p. 5].

For another, any concerns Terracon has that Mr. Yacyshyn failed to consider certain facts or that his opinions should otherwise be discounted in light of other record evidence should explored on cross-examination and do not warrant exclusion.  *See Cf. Grayiel v. AIO Holdings, LLC* (*Grayiel 1*), No. 3:15-CV-00821-CHB-LLK, 2019 WL 2372901, at *4 (W.D. Ky. Mar. 15, 2019), *report and recommendation adopted,* No. 3:15-CV-821-CHB-CHL, 2019 WL 2372899 (W.D. Ky. Apr. 29, 2019) ("Defendants also argue that [the proposed expert] did not consider appropriate facts and context in his valuation. . . . In creating his projected values, [the witness] used the available financial information . . . and applied it through his chosen and commonly accepted method of valuation.  This is not 'junk science,' it is a difference of opinion.  Defendants are free to question the methods and data utilized by [the witness] on cross-examination.").

*Causation.*  Last within this context, Terracon argues that Mr. Yacyshyn has failed to provide a basis for his opinion that the alleged breach caused any damage to Rumpke.  *See* [R. 86, pp. 12–16].  Here, Terracon again argues that "[t]here are no calculations, data, testing, or other results to support his opinion that a different conclusion [regarding remedial options] would have been reached if Terracon had performed the geotechnical exploration and laboratory testing that Mr. Yacyshyn claims it should have performed[.]"  *Id.* at 13

But the law, as discussed above, does not require Mr. Yacyshyn to have performed his own testing for his opinion on causation to be reliable.  To the contrary, he was permitted to rely on his professional experience (applied to the facts of this case) to reach his opinion that, based on what he thinks Terracon should have done (appropriate testing), the results would have been different (proper remedial options would have been recommended).

In every case, there are innumerable variables that might affect an expert's opinion.  But an expert's failure to consider every single variable does not *ipso facto* render that expert's opinion unreliable.  *Cf. Potts v. Martin & Bayley, Inc.*, No. 4:08-CV-00015, 2011 WL 4703058, at *5 (W.D. Ky. Oct. 4, 2011) ("[A]n expert is not required to rule out all alternative possible explanations.").  Terracon is entitled to dispute the conclusions reached by Mr. Yacyshyn, including that Terracon should have only ever offered pier walls as remedial options.  But Terracon's dispute as to that conclusion provides no grounds for the Court to exclude Mr. Yacyshyn's testimony and opinions.  *See Newell Rubbermaid*, 676 F.3d at 527 (quoting *Daubert*, 509 U.S. at 594–95) (explaining that the reliability inquiry "is a flexible one, and the focus must be solely on principles and methodology, not on the conclusions they generate") (cleaned up); *cf. Mutersbaugh v. Gen. Elec., Inc.*, No. 5:17-CV-1300, 2019 WL 1409379, at *1 (N.D. Ohio Mar. 28, 2019) ("The evidence need not be 'unassailable' to be admissible." (quoting *United States v.*

- 53 -

*Turner*, 287 F. App'x 426, 433 (6th Cir. 2008)).   Terracon's arguments for excluding Mr. Yacyshyn's opinion regarding back-calculations are unpersuasive and that request will be denied.[16]

        **b.**    **Terracon's Motion to Exclude Mr. Yacyshyn's Opinion Related to the Factor of Safety**

Second, Terracon argues that "[t]he Court should exclude Mr. Yacyshyn's opinion that Terracon breached the standard of care by using the wrong factor of safety."[17]   [R. 86, p. 16]. Rumpke's response provides background for Mr. Yacyshyn's opinion:

> Ron Ebelhar (Terracon's Senior Principal/Geotechnical Engineer) determined that the Perimeter Berm required a minimum factor of safety of 1.25 because he classified the Perimeter Berm as a "facility liner component."  Based on his own review of the Perimeter Berm and Kentucky's requirements, Mr. Yacyshyn disagrees.  Specifically, My. Yacyshyn has opined that the Perimeter Berm is considered "subbase" or "subgrade" because its intended function is to hold back waste in the landfill.  The appropriate factor of safety for remedial measures for the Perimeter Berm should, therefore, have been 2.0.  None of the remedial measures proposed by Terracon satisfy the 2.0 factor-of-safety requirement.  As a result, Mr. Yacyshyn's opinion is that Terracon's failure to design its remedial measure to meet a 2.0 factor of safety constitutes a breach of the standard of care.

[R. 93, p. 13] (record citations and internal footnote omitted).

Terracon argues that Mr. Yacyshyn's opinion that Terracon breached the standard of care by failing to use the correct factor of safety should be excluded for three reasons: (1) "Mr.

---

[16] In response to Terracon's causation arguments, Rumpke has submitted a declaration of Mr. Yacyshyn, in which he represents that he holds all the opinions contained in the four CEC reports and in his deposition to be within a reasonable degree of certainty.  *See* [R. 93-3 p. 3].  The Court finds the declaration unnecessary and therefore does not consider it.

[17] As described by the parties, "[i]n slope stability analyses, the factor of safety is the ratio between the strength of the material below, or the 'resisting force' and the weight of the slope above, or the 'driving force.'  The higher the factor of safety, the more stable the slope is."  [R. 86, p. 2 n.2] (citing [R. 57-1, p. 22 (Ebelhar Dep. at 77:11–20)]); *see also* [R. 52-1, p. 5] ("The factor of safety for a slope is a measure of stability represented by: the capacity (or strength) of the existing soils along a failure surface divided by the demand (or weight) of the soils and any external loading or force acting on the soils on or above failure surface.").

Yacyshyn is impermissibly parroting the opinion of a non-testifying, late-disclosed witness";
(2) "because it is unreliable; and (3) "[t]he Court should exclude Mr. Yacyshyn's opinion that
Terracon's factor of safety calculation caused damage to Rumpke . . . because he has no idea if a
different factor of safety would have produced a different outcome." *See* [R. 86, pp. 16–21].

 *Parroting*.  Terracon first challenges Mr. Yacyshyn's opinion that Terracon breached the
standard of care by using the wrong factor of safety by arguing that this "opinion is based on the
inadmissible hearsay opinion of Danny Anderson of the Kentucky Department of Environmental
Protection, Division of Waste Management (i.e. DWM)."  *Id.* at 16.  But this argument overstates
Mr. Yacyshyn's testimony.  The relevant portion of his deposition reads:

> Q. . . . And it's your opinion that this section of the berm should have been
> classified as subgrade and subbase?
>
> A.  It's *our* opinion, and then *we confirmed* that with a gentleman by the
> name of Danny Anderson, who's the solid waste department head for
> Kentucky.
>
> Q. You talked to Danny Anderson?
>
> A.  Correct.
>
> Q. And what did he say?
>
> A.  Jeremy Heyerley talked to him, and Jeremy -- or excuse me.  Danny
> confirmed that he would interpret this as being part of that -- part of the
> system that was -- required a factor of safety of 2.0.

[R. 86-2, p. 13 (Yacyshyn Dep. at 146:6–20) (emphasis added)].  Thus, Mr. Yacyshyn testified as
to his opinion (that the berm should have been classified as subgrade and subbase) and then said
he and his colleague *confirmed* such an opinion by speaking to Mr. Anderson.  *Id.*  This is an
important distinction from the cases that Terracon relies upon in support of its position.  *See, e.g.,*
*Gould Elecs. Inc. v. Livingston Cnty. Rd. Comm'n*, No. 17-11130, 2020 WL 6793335, at *8 (E.D.

Mich. Nov. 19, 2020), *aff'd*, No. 20-2257, 2022 WL 1467650 (6th Cir. May 10, 2022); *Terhune v. Cooksey*, No. 3:20-CV-611, 2022 WL 1644620, at *5 (W.D. Ky. May 24, 2022).

In *Gould Electronics*, the court found an expert's opinion was not reliable when he "never established the reliability of any opinions he expressed," "did not testify that these opinions were premised on his own independent analysis," and the "opinions appeared to be based in a significant way on [a non-testifying expert's] analysis." 2020 WL 6793335, at *8.  And in *Terhune*, an expert witness was prevented from testifying regarding a plaintiff's need for future medical procedures based on what another non-testifying expert witness had *told* her because "the Federal Rules of Evidence do not 'permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible.'"  *See Terhune*, 2022 WL 1644620, at *5 (quoting *Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*, No. 3:18-CV-00197, 2019 WL 3416677, at *10 (W.D. Ky. July 29, 2019)).

Here, however, Mr. Yacyshyn testified that he formed *his own opinion* regarding how the berm should have been classified, then confirmed that opinion with an individual from the state; Mr. Yacyshyn did not try to pass off Mr. Anderson's opinion as his own.  *Compare* [R. 86-2, p. 13 (Yacyshyn Dep. at 146:9–10) ("It's our opinion, and then we confirmed that. . .")], *with Gould Elecs.*, 2020 WL 6793335, at *8 ("His testimony does not make clear to what extent the documents represent his own views, those of [the non-testifying witness], or some combination of the two.").  Moreover, as discussed above, Terracon's arguments that Mr. Anderson was improperly or untimely disclosed lack merit.  *See supra* Section II.  Thus, this argument by Terracon provides no grounds for excluding Mr. Yacyshyn's testimony or opinions.

Finally, to the extent that Terracon maintains that Mr. Yacyshyn should be prohibited from testifying as to any legal interpretation (a concern it also raised regarding Mr. Anderson), the Court

finds that consideration of such an argument is best deferred until trial when proper context can be considered.  *See Grayiel 2*, 2019 WL 2372899, at *1.

*Reliability*.  Next, Terracon argues that Mr. Yacyshyn's opinion that Terracon breached the standard of care by using an incorrect factor of safety should be excluded as unreliable.  *See* [R. 86, pp. 18–19].  Here, Terracon maintains that Mr. Yacyshyn *concedes* that Terracon met the standard of care with respect to the factor of safety approved by the DWM for a minor permit modification.  *Id.* at 18 ("As noted above, Rumpke submitted a Minor Permit Modification request to DWM noting that Terracon had performed its slope stability analysis using a factor of safety of less than 2.0.  On May 7, 2010, DWM approved the Minor Permit Modification, including the factor of safety calculation of less than 2.0.  At his deposition, Mr. Yacyshyn admitted that an engineer meets the standard of care by relying on permit approval from the governing regulatory authority . . .. Because DWM approved Terracon's use of a factor of safety of less than 2.0 in connection with its slope stability analysis, and because Mr. Yacyshyn admits that Terracon met the standard of care by relying on regulatory approval of its calculation, Mr. Yacyshyn cannot now offer any reliable opinions that Terracon breached the standard of care by not using a factor of safety of 2.0.").  But Terracon again overstates (if not blatantly misrepresents) Mr. Yacyshyn's position.[18]

To be sure, Mr. Yacyshyn has consistently maintained that the minor permit modification was only for groundwater wells and did not extend to the entire slope analysis.  For example, CEC's rebuttal expert report states: "The permit modification subsequently approved on May 7, 2010, related to APE 20090004, Solid Waste Permit #096-00001, was limited to abandonment and

---

[18] In its reply, Terracon also represents that it was unaware of Mr. Yacyshyn's opinion regarding the groundwater well permits.  *See* [R. 96, pp. 14–15].  But this opinion was *clearly disclosed* in CEC's rebuttal report.  *See* [R. 56-1, pp. 2–3].  The Court must express its frustration at Terracon's underhanded arguments that have no support in the record.

replacement of groundwater wells, and makes no reference to and does not indicate that Kentucky State regulators approved Terracon's design modifications or the slope stability analysis for the West Berm." *See, e.g.*, [R. 56-1, p. 3]. Then, the report continued to opine that:

> Even if there was regulatory approval, an approval by Kentucky State regulators does not negate Terracon's (formerly H. C. Nutting Engineers – Cincinnati) professional obligation to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances, or Terracon's obligation to properly follow and apply the state regulations that require a minimum factor-of-safety of 2.0 for the subbase (401 KAR 48:080 Section 10). The West Berm supports the liner system and thus is considered a subbase. Relying solely on regulatory approval instead of exercising the required degree of care and skill of a reasonably competent geotechnical engineer, and complying with the regulation requirements, puts the owner/applicant at undue risk and does not satisfy the Standard of Care.

*Id.*

Thus, as Rumpke argues in its response, Terracon's representation that Mr. Yacyshyn somehow agreed that Terracon was able to rely on the permit for groundwater wells for the entire slope stability analysis (when he agreed "that a reasonable engineer could assume it satisfied the standard of care *if* KDEP actually approved" the plan) is simply unsupported by the record. *See* [R. 93, p. 17] (emphasis in original). This argument therefore provides no grounds for the Court to exclude Mr. Yacyshyn's testimony or opinions.

*Causation.* Finally, Terracon argues (again) that Mr. Yacyshyn's opinion regarding the factor of safety should be excluded because "he has no idea if a different factor of safety would have produced a different outcome." [R. 86, p. 20]. The Court addressed the same arguments above in the context of Mr. Yacyshyn's opinion regarding back-calculations being insufficient and need not restate that analysis here. Instead, the Court reiterates that it finds Rumpke has shown by a preponderance of proof that Mr. Yacyshyn's opinions are reliable, because they are based on his

professional experience in reviewing facts and data of record. Terracon's motion to exclude Mr. Yacyshyn's testimony and opinions will be denied.

## IV. Terracon's Motion for Summary Judgment

### A. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. When, as here, defendants move for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. Fed. R. Civ. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Liberty Lobby*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

### B.    Terracon's Motion

Following prior motions practice, Rumpke's remaining claims against Terracon are for professional negligence, breach of warranties, breach of contract, and unjust enrichment.  *See* [R. 66].  For each of these claims, Rumpke maintains that Terracon breached the professional standard of care Terracon owed to Rumpke.  *See, e.g.*, [R. 1, ¶ 81 (Professional negligence claim: "In performing services for Rumpke, H.C. Nutting/Terracon owed a duty to Rumpke to exercise the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances.")]; *id.* at ¶¶ 94–95 (Breach of warranties claim: "As described above, H.C. Nutting/Terracon breached these representations by failing to perform their services in a quality, professional and workmanlike manner, free from defects and fit for its intended purpose.  As a direct and proximate result of H.C. Nutting/Terracon's breaches of these express and implied warranties, Rumpke has incurred damages, in an amount exceeding this Court's jurisdictional limit."); *id.* at ¶ 100 (Breach of contract claim: "Terracon's failure to provide adequate services to Rumpke constitutes a breach of contract, as a result of which Rumpke has been damaged."); *id.* at ¶¶ 105–07 (Unjust enrichment claim: "H.C. Nutting/Terracon did not meet the degree of care and skill expected of a reasonably competent geotechnical engineer acting under similar circumstances in their provision of subsurface investigation/laboratory testing, geotechnical design/analysis, and construction details and implementations services to Rumpke.  H.C. Nutting/Terracon's provision of services caused Rumpke substantial damages.  Under these circumstances, it would be unjust for H.C. Nutting/Terracon to retain payments Rumpke made to H.C. Nutting/Terracon.").

Through its motion for summary judgment, Terracon argues that expert testimony is required for Rumpke to establish its claims. *See, e.g.*, [R. 87, p. 3 ("Expert testimony is required to establish the standard of care and a breach of that standard of care unless the relevant inquiry is within the general or common knowledge of laypersons.")]; [R. 98, p. 2 ("All of Rumpke's remaining claims likewise require proof of causation and a non-speculative calculation of Rumpke's claimed damages and, as a result, Rumpke's inability to establish either of those elements with the requisite expert testimony requires dismissal of all of Rumpke's remaining claims.") (internal footnotes omitted)]. Then, it argues that, because it believes its motions to exclude the expert testimony and opinions of Dr. Baldwin and Mr. Yacyshyn should be granted, Rumpke will be unable to establish key elements of its claims, namely "(1) that Terracon breached of the applicable standard of care; (2) that any alleged breach was the proximate cause of Rumpke's claimed injury; and (3) a non-speculative calculation of Rumpke's claimed damages based on the cost of constructing pier walls in 2019 instead of in 2010." *See, e.g.*, [R. 98, p. 1]; *see also* [R. 87]. In other words, Terracon argues that, because its motions to exclude should be granted, its motion for summary judgment should also be granted.

For all the reasons extensively discussed above, the Court has concluded that Terracon's motion to exclude Mr. Yacyshyn's testimony and opinions should *not* be granted. Thus, the foundational premise on which Terracon bases its motion for summary judgment regarding the majority of its claims has failed to come to fruition. Terracon has only argued that it is entitled to summary judgment on "all claims" if Mr. Yacyshyn's testimony about the standard of care is excluded.[19] [R. 87, pp. 3–5].

---

[19] Notably, Terracon has not argued other grounds on which it would be entitled to summary judgment. For example, it has not argued that, even if the Court were to consider Mr. Yacyshyn's testimony and opinions, there would be no genuine disputes of material fact regarding the contents of his testimony. *See, e.g.*, [R. 94, p. 2

However, the Court did conclude that Dr. Baldwin's testimony *should* be excluded.  In that scenario, Terracon argues it is "entitled to summary judgment on Rumpke's damages claim related to the cost of installing pier walls in 2019."  *Id.* at 5.  Terracon's argument related to damages is barely a page long and wholly undeveloped on that ground.  *See id.* at 5–6.  Given the parties' failure to engage with the law or facts relevant to the need for a damages expert, the Court need not consider the issue.  *See Members Heritage Credit Union v. New York Marine & Gen. Ins. Co.*, 5:21-CV-207, 2023 WL 4876383, *13 (E.D. Ky. July 31, 2023) (explaining that the party's argument "is wholly undeveloped, and the Court need not consider it); *Brown v. Astrue*, No. 09-387, 2010 WL 4878866, *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Nonetheless, the Court will address the merits of the motion.

As the first basis for their argument, Terracon argues that, without an expert, Rumpke cannot prove its damages because "[c]alculating construction costs and preparing construction estimates requires specialized training and knowledge, and it is beyond the purview of the ordinary lay person."  [R. 87, p. 5].  It is difficult to see how Terracon can credibly maintain both that the damages calculations "require[] specialized training and knowledge" that is "beyond the purview of the ordinary lay person," *id.*, *and* that Dr. Baldwin's should not be allowed to testify because his calculations were "based on nothing more than  . . . grade school arithmetic."  [R. 85, p. 14]. As discussed above, Rumpke's theory of damages calculation does not require specialized

---

(Rumpke's Response) ("Other than its expert-exclusion arguments, Terracon does not identify a single portion of the record where it can establish the absence of a genuine issue of material fact.")].

knowledge nor expertise beyond the lay juror's ability, so the Court will not grant summary judgment on this ground.

Alternatively, Terracon argues that Rumpke's theory is "wholly speculative" and cannot be calculated with "reasonable certainty." [R. 87, p. 6]. To be sure, "'contingent, uncertain and speculative damages generally may not be recovered' under Kentucky law." *EQT Prod. Co. v. Magnum Hunter Prod. Co.*, 266 F. Supp. 3d 961, 972 (E.D. Ky. 2017) (quoting *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009)) (cleaned up). However, it is "the *existence* of damages" that "must be proven to a reasonable certainty." *See Grayiel v. AIO Holdings, LLC*, (*Grayiel 3*), No. 3:15-CV-821, 2023 WL 5281933, at *6 (W.D. Ky. Aug. 16, 2023), *aff'd*, No. 23-5008, 2024 WL 2992676, *4 (6th Cir. June 14, 2024) (emphasis in original). "[W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages." *EQT Prod.*, 266 F. Supp. 3d at 972–73 (quoting *Curry*, 301 S.W.3d at 506)). In *EQT Prod.*, the court did not grant summary judgment on the damages issue because it found "a genuine issue of material fact as to whether and to what extent EQT suffered damages flowing from the alleged breach." *Id.* at 976.

In this case, Terracon argues that "there is no evidence in the record that would enable Rumpke to calculate this portion of its damages claim with reasonable certainty, as Kentucky law requires." [R. 87, p. 6]. The Court disagrees. Rumpke has presented evidence related to Terracon's 2008 and 2015 estimates for building a pier wall, as well as the final 2019 costs. *See, e.g.*, [R. 85-1, p. 55] ("Final Cost Breakdown" spreadsheet produced by CSA showing the actual cost of the completed CSA project was $3,486,292.24); [R. 91-1, p. 36 (Bruce E. Rome, senior civil engineer for Terracon, Dep. at 135:8–16)] ("Q. And so based on your hard data and Ron's comments to the hard data from a previous Scherzinger project at the ELDA Landfill you were

able to come up with this $990,625 estimate?  A.  Yes.  Q.  Do you feel confident that the wall could have been built in 2015 for $990,000?  THE WITNESS:  Yes.") (objection omitted); [R. 57-1, pp. 622–23] (email from Ebelhar to Fairchild after providing "schematic of the proposed construction, a diagram that shows how the stub pier works, and an Estimate of Probable Construction Cost for the stub pier option discussed In our draft report for the West Slope at PCLF" stating that Ebelhar had "used a conservative estimate for the stub piers - it may not be quite that much per foot but it's in the ballpark"); [R. 1-2, pp. 2–3] (letter from Terracon to Rumpke discussing cost of three remedial options in 2008 and specifically discussing pier wall option").  The Court finds such evidence creates a genuine dispute of material fact, thus precluding summary judgment.

The Court's conclusion is supported by a Kentucky Court of Appeals case in which that court reviewed a trial court's award of damages following a bench trial where the court calculated damages using pay requests submitted by the plaintiff, a painting subcontractor, to the defendant, the general contractor.[20]  *D.W. Wilburn, Inc. v. H&H Painting, LLC*, 648 S.W. 3d 687, 690–92 (Ky. Ct. App. 2022).   Despite Defendant's arguments that the requests were too speculative to support an award of damages because they were estimates, the court held "the perceived uncertainty of the amounts on the pay requests [would] not operate to thwart an award of damages."  *Id.* at 694.   On appeal, the court found that "these pay requests, considered in conjunction with [Plaintiff's] testimony, constitute[d] substantial evidence supporting the trial court's award of damages."  *Id.* at 695.

---

[20]  The Court recognizes that the procedural posture of *D.W. Wilburn*—appellate review of a trial court's findings of damages during a bench trial—is different than the instant matter—a motion for summary judgment.  Nonetheless, the nature of the evidence relied on by the *D.W. Wilburn* court is similar to the damage evidence presented here, and the Court finds its reasoning persuasive.

The estimates Terracon provided in this case are comparable to the payroll estimates relied on by the *D.W. Wilburn* court and move Rumpke's theory on damages from the "wholly speculative" to a jury issue precluding summary judgment.  Lastly, and as mentioned previously, Terracon's arguments concerning the differences between the 2008 and 2015 concepts and the wall that was actually constructed are well-taken.  But such concerns can be properly addressed through vigorous cross-examination.  *Cf. In re Scrap*, 527 F.3d at 532 (explaining, in response to the defendant's challenge to an expert's use of certain data to calculate damages, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence" (quoting *Daubert*, 509 U.S. at 596)).

Given the evidence of record as explained above, the Court disagrees with Terracon's argument that "there is no evidence in the record that would enable Rumpke to calculate this portion of its damages claim with reasonable certainty."  [R. 87, p. 6].  As such, the Court will deny Terracon's motion for summary judgment on this ground.

## V.    Conclusion

As a final matter, the Court acknowledges that Terracon has requested oral argument on several of its motions.  *See* [R. 85]; [R. 86]; [R. 87].  However, the Court finds that the legal issues presented, including those relating to expert testimony, have been adequately briefed and that oral argument is unnecessary.  *See, e.g.*, *Burris*, 2021 WL 3190747, at *1 ("[T]he district court may, but is not required to hold a hearing to address a *Daubert* issue.").  Accordingly, for the foregoing reasons, and with the Court being otherwise sufficiently advised,

- 65 -

**IT IS HEREBY ORDERED** as follows:

1. Terracon's Motion to Strike Plaintiff's Supplemental Expert Witness Disclosures, **[R. 82]**, is **GRANTED in part** and **DENIED in part**.  The motion will be **GRANTED** to the extent it seeks to prohibit Rumpke from calling Danny Anderson as an *affirmative* expert witness (a matter Rumpke concedes was an error in drafting the supplemental expert witness disclosures).  The motion is **DENIED** in all other respects.

2. Rumpke's Motion to Exclude Expert Testimony of William Fairchild, **[R. 83]**, is **GRANTED**.  Fairchild is permitted to offer fact testimony, but he is not qualified to provide expert testimony under Federal Rule of Evidence 702.

3. Terracon's Motion to Exclude the Testimony and Opinions of William T. Baldwin, Ph.D., **[R. 85]**, will be **GRANTED**.

4. Terracon's Motion to Exclude the Testimony and Opinions of B. Michael Yacyshyn, **[R. 86]**, is **DENIED**.

5. Terracon's Motion for Summary Judgment, **[R. 87]**, is **DENIED**.

6. Rumpke's Motion for Leave to File a Sur-Reply, **[R. 101]**, is **GRANTED.**

7. The Clerk of Court is **DIRECTED** to file the Sur-Reply, **[R. 101-1]**, of record.

8. Within **thirty (30) days** of the entry of this Memorandum Opinion and Order, the parties **SHALL** file a joint status report indicating the status of any ongoing settlement discussions, whether they request the matter be referred to the Magistrate Judge for an additional settlement conference, and whether they request a trial date.  Should the parties request a trial date, they must provide three mutually agreeable dates between January 27, 2025, and June 27, 2025, when this matter may be scheduled for trial.  The

report shall include an estimation of how long the parties anticipate trial in this matter

lasting.

This the 30th day of September 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY